UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| PLUMBERS & STEAMFITTERS LOCAL 773 PENSION FUND, Individually and on Behalf of All Others Similarly Situated, | : : : : | Civil Action No. **08-cv-8761** <br><br> <u>CLASS ACTION</u> |
| Plaintiff, | : : : | COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |
| vs. | : : | |
| ELAN CORPORATION, PLC, G. KELLY MARTIN and JAMES E. CALLAWAY, | : : : | |
| Defendants. | : : : | |
| | x | <u>DEMAND FOR JURY TRIAL</u> |

## INTRODUCTION AND OVERVIEW

1.      This is a class action for violations of the anti-fraud provisions of the federal securities laws on behalf of all purchasers of Elan Corporation, plc ("Elan" or the "Company") publicly traded stock or American Depository Receipts ("ADRs") between June 17, 2008 and July 29, 2008 (the "Class Period"), who were damaged thereby.

2.      Elan is a neuroscience-based biotechnology company.  During the Class Period, defendants made materially false and misleading statements about bapineuzumab, a drug Elan was developing in association with Wyeth for the treatment of Alzheimer's disease.  Specifically, defendants failed to disclose unfavorable results from a Phase II clinical study of bapineuzumab that Elan and Wyeth conducted.  When those results were finally disclosed, the price of Elan's ADRs plunged from $33.75 to $19.63 in one day as artificial inflation came out of the stock price.

## JURISDICTION AND VENUE

3.      The claims asserted arise under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act"), 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.  Jurisdiction is conferred by §27 of the 1934 Act, 15 U.S.C. §78aa.

4.      Venue is proper here pursuant to §27 of the 1934 Act.  Elan conducts business in this District and its ADRs trade on the New York Stock Exchange ("NYSE"), which is located in this District.

## THE PARTIES

5.      Plaintiff Plumbers & Steamfitters Local 773 Pension Fund purchased Elan securities during the Class Period as set forth in the attached certification and was damaged thereby.

6.      Defendant Elan maintains operations at 875 Third Avenue, 3rd Floor, New York, New York.  Elan's ADRs are traded on the NYSE and the London Stock Exchange, which are

efficient markets.  The Company's stock trades on the Dublin Stock Exchange, which is also an efficient market.

7.      Defendant G. Kelly Martin ("Martin") was Elan's President and Chief Executive Officer ("CEO") at all relevant times.

8.      Defendant James E. Callaway ("Callaway") was Elan's Senior Vice President, Head of Immunotherapy Alzheimer's Disease Clinical Programs at all relevant times.

9.      The defendants identified in ¶¶7-8 are referred to herein as Individual Defendants.

## BACKGROUND

10.      Alzheimer's disease is a progressive brain disorder that gradually destroys a person's memory and ability to learn, reason, make judgments, communicate and carry out activities of daily living, such as bathing and eating.  As Alzheimer's disease progresses, individuals may also experience changes in personality and behavior, such as anxiety, suspiciousness or agitation, as well as delusions or hallucinations.  Alzheimer's disease is one of many forms of dementia.  It affects the brain's physical structure and is characterized by the presence of amyloid plaques and neurofibrillary tangles.

11.      Scientific evidence suggests that a peptide called beta amyloid plays a role in the pathology of Alzheimer's disease.  One approach to slowing or stopping the course of Alzheimer's disease may lie in clearing beta amyloid from the brain.

12.      Bapineuzumab was designed to clear toxic beta amyloid from the brain, with the hope that this might slow or prevent the progressive neurodegeneration in the brain associated with Alzheimer's disease.

13.      For more than eight years, Elan's and Wyeth's Alzheimer's Immunotherapy Program actively pursued treatments based on the beta amyloid hypothesis.  Bapineuzumab was the lead

immunotherapeutic compound being developed by Wyeth and Elan through their Alzheimer's Immunotherapy Program.

## CLASS PERIOD EVENTS AND STATEMENTS

14.     On June 17, 2008, Elan and Wyeth issued a press release which stated the following:

**Elan and Wyeth Announce Encouraging Top-line Results from Phase 2 Clinical Trial of Bapineuzumab for Alzheimer's Disease**

- ***Safety And Efficacy Findings Support Design Of Phase 3 Program***

- ***Primary Efficacy Endpoints In Overall Study Population Not Statistically Significant***

- ***Statistically Significant And Clinically Meaningful Benefits Seen In ApoE4 Non-Carriers***

- ***Overall Results Support Prior Decision To Initiate Phase 3***

- ***Detailed Data Presentation At ICAD July 29, 2008***

Elan Corporation, plc and Wyeth today announced encouraging preliminary findings from a Phase 2 study of bapineuzumab (AAB-001) in patients with mild to moderate Alzheimer's disease. In the 18-month trial, bapineuzumab appeared to have clinical activity in treating Alzheimer's disease.

Efficacy Findings

        The study did not attain statistical significance on the primary efficacy endpoints in the overall study population.  Post-hoc analyses did show statistically significant and clinically meaningful benefits in important subgroups.

        In non-carriers of the Apolipoprotein E4 (ApoE4) allele, estimated in the literature to be from 40 to 70 percent of the Alzheimer's disease population, post-hoc analyses showed statistically significant and clinically meaningful benefits associated with bapineuzumab treatment on several key efficacy endpoints, including the Alzheimer's Disease Assessment Scale (ADAS-cog), the Neuropsychological Test Battery (NTB), the Mini Mental State Examination (MMSE) and the Clinical Dementia Rating - Sum of Boxes (CDR-SB).  A favorable directional change was seen on the Disability Assessment Scale for Dementia (DAD), although this was not statistically significant.

        Additionally in non-carriers, preliminary evaluation of MRI results showed less loss of brain volume among treated patients versus placebo patients, a finding that was statistically significant.  Smaller increases in ventricular volume were seen in treated patients compared to placebo patients, although this finding was not

- 3 -

statistically significant.  Progression of Alzheimer's disease is generally associated with loss in brain volume and increases in ventricular volume.  Further, treatment-related benefits seen on MRI were correlated to the favorable clinical changes observed in non-carriers.

In similar post-hoc analyses of carriers of the ApoE4 allele, no clinical benefits or statistically significant effects were observed on efficacy endpoints or the brain volume endpoint.  However, favorable directional changes were observed on a number of endpoints.  Preliminary analyses suggest possible increase of ventricular volume in treated patients versus placebo patients.  The clinical significance of this finding is currently unclear and analyses are ongoing.

Safety Findings

As expected given the nature of the population studied, adverse events were very common in both placebo and bapineuzumab-treated patients.  In non-carriers, the number of patients experiencing serious adverse events was similar between placebo and bapineuzumab-treated patients.  In carriers, serious adverse events were more frequently observed in bapineuzumab-treated patients than in placebo patients.  In addition, vasogenic edema was reported in the treated population with an increased frequency in carriers and at higher doses.  No cases were reported in placebo patients.  In the ongoing Phase 3 studies, carriers of the ApoE4 allele are being treated with a lower dose to minimize the risk of vasogenic edema.  The Companies believe that the overall safety findings from this Phase 2 trial support their prior decision to move to Phase 3 studies.

CEO Comments

"The preliminary analyses of the Phase 2 study are a continued validation of the amyloid approach to Alzheimer's disease and an important milestone in our companies' ongoing commitment to bring new treatment options to patients," said Kelly Martin, President and CEO of Elan.  "These results clinically support our decision to move into Phase 3 last year."

"We are encouraged by these findings.  We remain driven by science and focused on patients as we work to bring this treatment to those who desperately need new options," said Bernard Poussot, President and CEO, Wyeth.  "We recognize there is a great deal of hard work left as we move from this phase of learning towards confirming the potential of bapineuzumab."

Elan and Wyeth plan to continue all four studies in the previously disclosed bapineuzumab Phase 3 clinical program and will review and discuss these data with regulatory authorities and leading medical experts.

These findings reflect preliminary analyses of the Phase 2 data and its implications for ongoing clinical development of bapineuzumab.  In this trial, there were imbalances in patient numbers and characteristics at baseline between subgroups studied that may or may not have affected these results.  Further analysis

will continue in advance of a planned scientific presentation of detailed results of this study at the International Conference on Alzheimer's Disease (ICAD) in Chicago, July 29, 2008.

15.     As a result of these statements, the price of Elan's ADRs shot from $27.11 to $30 in one day, an increase of over 10% as the price became artificially inflated.

16.     Defendants' statements set forth above were materially false and misleading because defendants failed to disclose the full, unfavorable results of the Phase II clinical study of bapineuzumab.  Specifically, defendants failed to disclose that the efficacy results of the study were not as strong as defendants characterized them to be and that some of the patients taking bapineuzumab suffered adverse events that might have been related to the drug.

### THE TRUTH BEGINS TO EMERGE

17.     On July 29, 2008, Elan and Wyeth issued a press release which stated as follows:

Elan Corporation, plc and Wyeth today are presenting detailed results from the companies' 18-month Phase 2 study of bapineuzumab (AAB-001) in patients with mild to moderate Alzheimer's disease at the Alzheimer's Association's International Conference on Alzheimer's Disease 2008 in Chicago, Illinois.  As previously announced, in the study, bapineuzumab appeared to have an acceptable safety profile and clinical activity in treating Alzheimer's disease.  Potential efficacy signals were seen at a range of doses without a clear dose response.  The study did not attain statistical significance on the pre-specified efficacy endpoints in the overall study population.   Post-hoc analyses showed statistically significant and clinically meaningful benefits in important subgroups.

The data will be presented by Sid Gilman, M.D., William J. Herdman Distinguished University Professor of Neurology, Director of Michigan Alzheimer's Disease Research Center, University of Michigan, and Chair of the independent safety monitoring committee for bapineuzumab.

"This study was limited in its size, design and goals," said Dr. Gilman, "but if the findings seen in these post-hoc analyses are replicated in the global Phase 3 program, it would be a validation of the amyloid hypothesis and could change how physicians approach the treatment of Alzheimer's disease."

Elan and Wyeth believe that the safety and efficacy findings from this Phase 2 trial of bapineuzumab in patients with mild-to-moderate Alzheimer's disease support the design of the ongoing global Phase 3 program and plan to incorporate learnings from this study into the Phase 3 program.  The companies will continue to

work diligently to develop much needed new treatment options for patients and physicians.

About the Phase 2 Clinical Trial

The double-blind, placebo-controlled multiple ascending dose trial was designed to assess the safety and tolerability of bapineuzumab in mild-to-moderate Alzheimer's disease and to explore efficacy at a range of doses. Two-hundred-thirty-four (234) patients were randomized to receive one of four doses of bapineuzumab (0.15 mg/kg (n=31), 0.5 mg/kg (n=33), 1.0 mg/kg (n=30) or 2.0 mg/kg (n=30)) or placebo (n=110) by intravenous infusion every 13 weeks. Findings were reported for 229 patients in a modified intent-to-treat (MITT) analysis. Patients were intended to receive up to six doses during the 18-month study.

The pre-specified primary efficacy endpoints were change from baseline in Alzheimer's Disease Assessment Scale-Cognitive Subscale (ADAS-cog) and Disability Assessment Scale for Dementia (DAD) in the 0.5 mg/kg, 1.0 mg/kg and 2.0 mg/kg dose groups against their placebo cohorts. Other efficacy measures included change in concentrations of tau in cerebral spinal fluid (CSF), the Neuropsychological Test Battery (NTB), the Clinical Dementia Rating Sum of Boxes (CDR-SOB), the Mini Mental State Examination (MMSE) and brain volume as measured by MRI. Efficacy was assessed from baseline for 78 weeks.

Pre-Specified Efficacy Analysis:

In the total study population, statistical significance was not obtained on the pre-specified efficacy endpoints of ADAS-cog and DAD.

Post-Hoc Efficacy Analyses:

Modified Intent to Treat (MITT) included patients who received at least one infusion and one efficacy assessment. In analyzing the data, the following were taken into account: an assumption of non linearity of the data over time, ApoE4 carrier status, and baseline MMSE and test scores.

The clinical relevance of the results for patients receiving the full 18 months of therapy was analyzed in a completer analysis. The patients included in the completer analysis received six (6) infusions and a week 78 efficacy assessment.

Using these assumptions, trends in favor of bapineuzumab treated patients were observed in ADAS-cog and NTB in the total MITT population. Additional completer analyses reinforced these trends.

The study revealed important differences in the rate of vasogenic edema by carrier status and for this reason the total population was analyzed by ApoE4 carrier status.

ApoE4 Non-Carrier Population

- 6 -

In the ApoE4 non-carrier patients, statistically significant differences from baseline to week 78 were observed in favor of bapineuzumab treated patients on both cognitive and functional efficacy endpoints:

- ADAS-cog treatment difference of 5.0; p=0.026

- NTB treatment difference of 0.35; p=0.006

- CDR-SB treatment difference of 1.5; p=0.040

A favorable directional change of 6.9, p>0.10 for DAD was observed.

The completer analysis for non-carrier patients was consistent with the above findings.

Additionally, in these non-carrier patients, MRI results showed significantly less brain volume reduction versus placebo, as measured by the Brain Boundary Shift Integral (BBSI), at 71 weeks, with a treatment difference of 10.7 cc; p=0.004. Smaller increases in ventricular volume (VBSI) in bapineuzumab treated patients compared to placebo were observed, which were not statistically significant. Progression of Alzheimer's disease is generally associated with loss in brain volume and increases in ventricular volume.

ApoE4 Carrier Population

In the ApoE4 carrier patients, no statistically significant changes were observed in any of the cognitive or functional efficacy endpoints. The completer analysis for the carrier population showed favorable directional changes on cognitive and functional endpoints. The ongoing Phase 3 studies in ApoE4 carriers will help clarify these findings.

MRI findings in the carrier patients showed no significant change in brain volume between bapineuzumab treated and placebo patients, while a significant increase in ventricular volume in treated patients was observed, mean 2.5cc; p=0.037. The clinical relevance of this finding is still unclear and will continue to be evaluated.

"The clinically significant benefit seen with bapineuzumab treatment in the ApoE4 non-carrier subgroup is encouraging," said Dale Schenk, Ph.D., Executive Vice President and Chief Scientific Officer of Elan. "These results across multiple endpoints are consistent with what we have seen for beta amyloid immunotherapy from animal studies through to the patients."

"These data represent scientific validation of our decision to move rapidly into Phase 3 last year," said Gary L. Stiles, M.D., Chief Medical Officer, Wyeth. "In our Phase 3 program, we will learn much more since we will be able to study bapineuzumab in larger patient populations and better assess the results in ApoE4

carriers and non-carriers in separate trials. We are encouraged by these results and we'll achieve greater insight as we move forward."

Safety Findings

Adverse Events (AE) were observed in 95% of bapineuzumab treated patients versus 90% of placebo treated patients. AEs were generally mild to moderate and transient. With the exception of vasogenic edema, AEs did not appear to be dose related.

Adverse events seen in greater than 5% of bapineuzumab treated patients and at twice the rate of placebo treated patients were: back pain; anxiety; vomiting; vasogenic edema; hypertension; weight loss; paranoia; skin laceration; gait disturbance; and muscle spasm.

Three deaths occurred in bapineuzumab-treated patients, though these were not considered by the investigators to be treatment related. No deaths were reported in the placebo group. Other adverse events of interest occurring in less than five percent of patients treated with bapineuzumab included cataract, deep vein thrombosis, syncope, seizures and pulmonary embolism.

Vasogenic Edema (VE)

Twelve (12) cases of vasogenic edema were reported, all in treated patients, and all resolved over time. Ten (10) of these cases were reported in ApoE4 carriers with 2 cases in ApoE4 non-carriers. Eight (8) of the 12 cases were reported in the highest dose group, including both cases seen in ApoE4 non-carriers. Six (6) of the 12 cases were not associated with clinical symptoms and were detected on routine MRI scan. One (1) patient was treated with steroids. Re-dosing was instituted in six (6) of the 12 patients and no recurrence of VE was observed.

Phase 3 Program Implications

The Phase 2 data reinforce the design of the ongoing Phase 3 studies by ApoE4 carrier and non-carrier populations and the selected dose groups. The companies plan to continue all four ongoing Phase 3 studies. The ApoE4 carrier dose in the Phase 3 trials was selected to seek to minimize the risk of VE observed in the Phase 2 trial. The companies intend to obtain feedback from regulatory authorities in the coming months to finalize parameters for the Phase 3 program and discuss and reach agreement on requirements for registration.

18.     As a result of these disclosures, the price of Elan's ADRs plunged from $33.75 to

$19.63 in one day, a 42% decline, as artificial inflation came out of the price.

- 8 -

**SCIENTER**

19.     During the Class Period, the defendants had both the motive and opportunity to conduct fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, the defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Elan stock and ADRs during the Class Period.

**LOSS CAUSATION/ECONOMIC LOSS**

20.     During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated Elan's stock price and operated as a fraud or deceit on Class Period purchasers of Elan stock by misrepresenting the Company's business.  Later, when defendants' prior misrepresentations and fraudulent conduct became apparent to the market, Elan's stock and ADR prices fell precipitously, as the prior artificial inflation came out of the prices over time.  As a result of their purchases of Elan stock and/or ADRs during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

**NO SAFE HARBOR**

21.     Elan's verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

22.     The defendants are also liable for any false FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of Elan who knew that the FLS was false.  None of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or

statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## APPLICABILITY OF PRESUMPTION OF
## RELIANCE:  FRAUD ON THE MARKET

23.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's stock and ADRs traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock and ADRs; and

(e)     Plaintiff and other members of the Class purchased Elan stock and/or ADRs between the time defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

24.     At all relevant times, the markets for Elan stock and ADRs were efficient for the following reasons, among others:

(a)     As a regulated issuer, Elan filed periodic public reports with the Securities and Exchange Commission;

(b)     Elan regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major

news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services; and

   (c) Elan ADRs were actively traded in an efficient market, namely the NYSE, under the symbol ELN.  Its stock traded on the London Stock Exchange and the Dublin Stock Exchange, which are also efficient markets.

**CLASS ACTION ALLEGATIONS**

  25. Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Elan stock or ADRs during the Class Period (the "Class").  Excluded from the Class are defendants, directors and officers of Elan and their families and affiliates.

  26. The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Elan had more than 400 million ADRs and shares of stock outstanding, owned by thousands of persons.

  27. There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

   (a) Whether the 1934 Act was violated by defendants;

   (b) Whether defendants omitted and/or misrepresented material facts;

   (c) Whether defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

   (d) Whether defendants knew or recklessly disregarded that their statements were false and misleading;

- 11 -

(e)      Whether the prices of Elan stock and ADRs were artificially inflated; and

(f)      The extent of damage sustained by Class members and the appropriate measure of damages.

28.      Plaintiff's claims are typical of those of the Class because plaintiff and the Class sustained damages from defendants' wrongful conduct.

29.      Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

30.      A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of §10(b) of the 1934 Act
### and Rule 10b-5 Against All Defendants

31.      Plaintiff incorporates ¶¶1-30 by reference.

32.      During the Class Period, defendants disseminated or approved the false statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

33.      Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)      Employed devices, schemes, and artifices to defraud;

(b)      Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     Engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of Elan stock and ADRs during the Class Period.

34.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Elan stock and ADRs.  Plaintiff and the Class would not have purchased Elan stock and/or ADRs at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

35.     As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other members of the Class suffered damages in connection with their purchases of Elan stock and ADRs during the Class Period.

## COUNT II

### For Violation of §20(a) of the 1934 Act Against All Defendants

36.     Plaintiff incorporates ¶¶1-35 by reference.

37.     The Individual Defendants acted as controlling persons of Elan within the meaning of §20(a) of the 1934 Act.  By virtue of their positions and their power to control public statements about Elan, the Individual Defendants had the power and ability to control the actions of Elan and its employees.  Elan controlled the Individual Defendants and its other officers and employees.  By reason of such conduct, defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

A.     Declaring this action to be a proper class action pursuant to Fed. R. Civ. P. 23;

B.     Awarding plaintiff and the members of the Class damages and interest;

C.     Awarding plaintiff's reasonable costs, including attorneys' fees; and

- 13 -

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: October  14, 2008                    COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            SAMUEL H. RUDMAN
                                            DAVID A. ROSENFELD


                                            _____
                                                    /S/ Samuel H. Rudman
                                                 SAMUEL H. RUDMAN

                                            58 South Service Road, Suite 200
                                            Melville, NY  11747
                                            Telephone:  631/367-7100
                                            631/367-1173 (fax)

                                            COUGHLIN STOIA GELLER
                                              RUDMAN & ROBBINS LLP
                                            DARREN J. ROBBINS
                                            MATTHEW P. MONTGOMERY
                                            655 West Broadway, Suite 1900
                                            San Diego, CA  92101
                                            Telephone:  619/231-1058
                                            619/231-7423 (fax)

                                            Attorneys for Plaintiff

- 14 -

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

PLUMBERS & STEAMFITTERS LOCAL 773 PENSION FUND ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action:

| Security | Transaction | Date | Price Per Share |
|----------|-------------|------|-----------------|

*See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as detailed below during the three years prior to the date of this Certification:

*Borochoff v. GlaxoSmithKline plc, et al.*, No. 07-cv-05574-LLS (S.D.N.Y.)
*Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of Commerce, et al.*, No. 08-civ-8143 (S.D.N.Y.)

6.    The Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery,

ELAN

except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this _13_ day of _OcToBER_ , 2008.

PLUMBERS & STEAMFITTERS LOCAL
773 PENSION FUND

By: _Lawrence Donnelly_

Its: _Fund Manager_

- 2 -

ELAN

## SCHEDULE A

## SECURITIES TRANSACTIONS

**Acquisitions**

| Date Acquired | Type/Amount of Securities Acquired | Price |
|---------------|-----------------------------------|-------|
| 06/18/2008 | 294 | $29.56 |