UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————— x
                                                  :
                                                  :          Master File No. 1:08-cv-08761-AKH
In re ELAN CORPORATION                            :
SECURITIES LITIGATION                             :
                                                  :
                                                  :
———————————————————— x


**MEMORANDUM OF LAW IN SUPPORT OF THE ELAN DEFENDANTS'
MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**


SHEARMAN & STERLING LLP
Jaculin Aaron
Daniel M. Segal
599 Lexington Avenue
New York, New York 10022-6069
(212) 848-4000
Fax: (212) 848-7179

*Counsel for Defendants*
*Elan Corporation, plc, G. Kelly Martin,*
*and Lars Ekman*

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..................................................................... 1

STATEMENT OF FACTS ........................................................................... 6

    A.    The Defendants.......................................................................... 6

    B.    Elan's Scientific Approach To Treating Alzheimer's Disease ................. 6

    C.    Alzheimer's Immunotherapy Program (AIP) and Bapineuzumab ............ 7

    D.    The Drug Development Process: Clinical Trials and FDA
          Involvement and Review........................................................... 9

    E.    Phase I Clinical Trial of Bapineuzumab .................................... 10

    F.    Phase II Clinical Trial of Bapineuzumab .................................. 11

    G.    Elan and Wyeth Decide To Commence Phase III Trials of
          Bapineuzumab ..................................................................... 13

    H.    Analysts' Speculation about the Phase II Data and Anticipation
          of the Release of the Phase II Top-Line Results and the
          Full Results at ICAD............................................................. 15

    I.    June 17, 2008 Announcement of the Top-Line Results for
          the Phase II Trial for Bapineuzumab ........................................ 18

    J.    Analyst Reports Discussing the Top-Line Phase II Results
          and Anticipating the Full Presentation of the Data at the
          ICAD Meeting on July 29, 2008 ............................................ 20

    K.    Presentation of the Results of the Phase II Trial at ICAD
          on July 29, 2008.................................................................. 22

    L.    Decline in the Price of Elan's ADRs and Reactions of
          Commentators  and Analysts.................................................. 23

    M.    Post-ICAD Events ............................................................... 27

ARGUMENT ....................................................................................... 27

    I.    THE COMPLAINT DOES NOT AND CANNOT ADEQUATELY
          ALLEGE THAT DEFENDANTS MADE ANY FALSE OR
          MISLEADING STATEMENTS.................................................. 28

A.  Elan's Statements Regarding the Commencement of the
    Phase III Trials Were Not False or Misleading ..................................... 28

    1.  There Are No Adequate Allegations That the Data from
        the 2007 Interim Review of the Phase II Trial Were Not
        "Strong" and "Meaningful" or Even "Spectacular".................... 29

    2.  The May 21, 2007 Announcement Clearly Articulated Elan
        and Wyeth's Rationale for Starting the Phase III Trials.............. 30

    3.  Elan Had No Duty To Update Investors Regarding Its
        Phase III Plans, Particularly in Light of the Vague and
        Inexact Statements of Intention at Issue ..................................... 31

B.  Elan and Wyeth's Statements Regarding the Top-Line Phase II
    Results Were Not False or Misleading .................................................. 33

    1.  The June 17, 2008 Press Release Was Not Misleading .............. 34

    2.  The Detailed Results of the Phase II Trial Were Not Required
        To Be Included in the June 17, 2008 Press Release.................... 35

        a.  No dose response shown ................................................. 36

        b.  "Larger than expected" decline in the placebo group ....... 38

        c.  Use of a curvilinear statistical model in the
            post hoc analyses ............................................................ 39

        d.  No short-term advantage for bapineuzumab ................... 40

        e.  Using the MMSE, allegedly no significant signal
            that bapineuzumab was effective..................................... 40

        f.  12 patients developed vasogenic edema, of which
            three developed microbleeds........................................... 41

        g.  Other adverse effects occurred two times as often
            in treated patients........................................................... 42

        h.  Bapineuzumab allegedly failed to show a statistically
            significant benefit per the original trial protocol by a
            "large margin" ................................................................ 43

C.  Elan and Wyeth's Joint Public Statements at the ICAD Conference
    on July 29, 2008, Did Not Contain False or Misleading Statements........ 44

D.  The Alleged Misrepresentations Are Protected by the "Safe Harbor"
    for Forward-Looking Statements............................................................ 44

II.    THE AMENDED COMPLAINT FAILS TO ADEQUATELY
ALLEGE SCIENTER ........................................................................ 46

    A.    Plaintiffs Have Not Alleged a Plausible Motive for Fraud ...................... 47

    B.    Plaintiffs' Allegations Do Not Support an Inference of Conscious
Misbehavior or Recklessness .................................................. 51

III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a)
OF THE SECURITIES EXCHANGE ACT ...................................................... 53

CONCLUSION .................................................................................... 53

# TABLE OF AUTHORITIES

## CASES

*Acito v. IMCERA Group, Inc.*, 47 F.3d 47 (2d Cir. 1995) ........................................................ 46

*In re Adolor Corp.*, 616 F. Supp. 2d 551 (E.D. Pa. 2009) .................................................... 33, 35

*Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993) ...................................................................... 27

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) .............................................................................. 27

*In re Astrazeneca Sec. Litig.*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008) ...................................... 51

*In re Axonyx Sec. Litig.*, No. 05 Civ. 2307, 2009 WL 812244
    (S.D.N.Y. Mar. 27, 2009) ................................................................................. 10, 49

*In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357
    (S.D.N.Y. Sept. 30, 2004) ....................................................................................... 42

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................................... 27

*In re Biogen Sec. Litig.*, 179 F.R.D. 25 (D. Mass. 1997) ......................................................... 35

*Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384
    (D.N.J. 2009) ......................................................................................................... 9

*In re Bristol-Meyers Squibb Sec. Litig.*, 312 F. Supp. 549 (S.D.N.Y. 2004) .............................. 32

*In re Carter-Wallace, Inc. Sec. Litig.*, 150 F.3d 153 (2d Cir. 1998) ......................................... 41

*In re Carter-Wallace, Inc. Sec. Litig.*, 220 F.3d 36 (2d Cir. 2000) ............................................ 51

*Chill v. General Electric Co.*, 101 F.3d 263 (2d Cir. 1996) ..................................................... 48

*Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991) ........................................ 28

*Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618 (4th Cir. 2008) ................................. 9, 47, 48, 49

*ECA and Local 134 Ibbew Joint Pension Trust of Chicago v. JP Morgan
    Chase Co*., 553 F.3d 187 (2d Cir. 2009*)* ................................................................. 50

*Elliot Assocs., L.P., v. Covance, Inc.*, No. 00 Civ. 4105, 2000 WL 1752848
    (S.D.N.Y. Nov. 28, 2000) ........................................................................................ 32

*Ellison v. Am. Image Motor Co. Inc.*, 36 F. Supp. 2d 628 (S.D.N.Y. 1999) .............................. 53

*Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) ................................................................. 50

*Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615 F. Supp. 2d 218
    (S.D.N.Y. 2009) ................................................................................................................ 46

*Hill v. The Tribune Co.*, No. 05 C 2602, 2006 WL 2861016
    (N.D. Ill. Sept. 29, 2006) ................................................................................................. 51

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759
    (2d Cir. 1991) ................................................................................................................ 28, 48

*In re Inspire Pharm., Inc. Sec. Litig.*, 515 F. Supp. 2d 631 (M.D.N.C. 2007) ........................... 48

*In re Int'l Business Machines Corp. Sec. Litig.*, 163 F.3d 102 (2d Cir. 1998) ........................... 32

*Johnson v. Pozen Inc.*, No. 1:07 CV 599, 2009 WL 426235
    (M.D.N.C. Feb. 19, 2009) ........................................................................................ *passim*

*Kalnit v. Eichler*, 99 F. Supp. 2d 327 (S.D.N.Y. 2000) .............................................................. 50

*Kalnit v. Eichler*, 264 F.3d 131 (2d Cir. 2001) .......................................................................... 46

*Kramer v. Time Warner Inc.*, 937 F.2d 767 (2d Cir. 1991) ........................................................ 28

*Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55 (2d Cir. 1996) ........................................... 33

*Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161 (2d Cir. 2005) ............................................. 27

*In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371 (S.D.N.Y. 2001) ................. 27, 28

*In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953 (D. Md. 1995) .......................................... 52

*In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152 (N.D. Ill. 2004) ........................... 28

*Noble Asset Mgmt. v. Allos Therapeutics, Inc.*, No. Civ. 04 CV-1030,
    2005 WL 4161977 (D. Colo. Oct. 20, 2005) ............................................................... 33, 38

*Novak v. Kasaks*, 216 F.3d 300 (2d Cir. 2000) ..................................................................... 28, 34

*Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2 (2d Cir. 1996) ........................................... 28

*Oppenheim Pramerica Asset Mgmt. v. Encysive Pharm., Inc.*, AH-0603022,
    2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ............................................................... 49

*In re Oxford Health Plans, Inc.*, 187 F.R.D. 133 (S.D.N.Y. 1999) ............................................. 44

*Padnes v. Scios Nova., Inc.*, No. Civ. 95-1693, 1996 WL 539711
    (N.D. Cal. Sept. 18, 1996) ................................................................35, 39, 52

*Papasan v. Allain*, 478 U.S. 265 (1986) .................................................. 28

*In re PDI Sec. Litig.*, No. Civ. A 02-211, 2006 WL 3350461
    (D.N.J. Nov. 16, 2006)............................................................................ 50

*In re Pfizer, Inc. Sec. Litig.*, 538 F. Supp. 2d 621 (S.D.N.Y. 2008) ......................................... 49

*Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564 (S.D.N.Y. 2009)............................................. 33

*In re Regeneron Pharm., Inc. Sec. Litig.*, No. 03 Civ. 3111 RWS,
    2005 WL 225288 (S.D.N.Y. Feb. 1, 2008) ................................................. 9, 10

*Rothman v. Gregor*, 220 F.3d 81 (2d Cir. 2000)........................................................ 28

*San Leandro Emergency Med. Group Profit Sharing Plan v. Philip
    Morris Co.*, 75 F.3d 801 (2d Cir. 1996) ....................................................... 33

*S.E.C. v First Jersey Sec. Inc.*, 101 F 3d 1450 (2d Cir. 1996).................................................... 53

*Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124 (2d Cir. 1994) ................................................. 50

*State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843 (2d Cir. 1981)........................................ 46

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007) ....................................... 5, 46

*In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259 (2d Cir. 1993) .......................................32, 33, 34

*Wechsler v. Steinberg*, 733 F.2d 1054 (2d Cir. 1984) ................................................... 50

*In re Xinhua Finance Media, Ltd. Sec. Litig.*, No. 07 Civ. 3594,
    2009 WL 464934 (S.D.N.Y. Feb. 25, 2009) .................................................. 33

## STATUTES

15 U.S.C. § 77z-2(c)(1)(A)(i) (1997) ......................................................... 44

15 U.S.C. § 78u-4(b)(1) (1997).........................................................28, 34

15 U.S.C. § 78u-4(b)(2) (2007)............................................................ 46

15 U.S.C. § 78u-5(c)(1)(B) (2007).......................................................... 45

## RULES

21 C.F.R. § 312.20 ...................................................................................................... 9

21 C.F.R. § 312.21(2) ................................................................................................. 9

21 C.F.R. § 312.47 (b)(1)......................................................................................... 10

Defendants Elan Corporation, plc ("Elan"), G. Kelly Martin, and Lars Ekman (the "Defendants") respectfully submit this memorandum of law in support of their motion to dismiss the Consolidated Complaint for Violations of the Federal Securities Laws (the "Complaint") pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure and pursuant to the Private Securities Litigation Reform Act (the "PSLRA"). Accompanying this memorandum is the Declaration of Jaculin Aaron, the exhibits to which are cited as "Ex. __." The Complaint is cited in the form "¶ __."

## PRELIMINARY STATEMENT

Elan is engaged in the research and development of biologic drugs for the treatment of terrible neurological diseases for which there is currently no cure and treatments of only marginal effectiveness. Elan pioneered the leading approach to treat Alzheimer's disease by inducing or activating the body's immune response in order to clear beta amyloid plaques in the brain. In collaboration with Wyeth Pharmaceuticals (which is not a defendant), Elan launched the Alzheimer's Immunotherapy Program (AIP) to develop drugs based on the immunotherapy concept. This innovative approach is at the cutting edge of scientific and medical research and so far has been sufficiently promising and encouraging that Elan and Wyeth have spent and committed hundreds of millions of dollars on the program, including to advance the biologic drug bapineuzumab (the subject of this lawsuit) to Phase III clinical trials. More recently, Pfizer cited bapineuzumab as one of the highlights of its $68 billion acquisition of Wyeth and, in the fall of 2009, Johnson & Johnson paid approximately $885 million to acquire 51% of Elan's interest in the AIP and agreed to pay an additional $500 million in AIP development expenses.

In short, four major pharmaceutical companies have committed enormous sums of money based on the belief that bapineuzumab could be the first safe and effective disease-modifying drug to treat Alzheimer's disease. The general premise of the Complaint – that bapineuzumab has been a failure – is simply nonsense. The specific allegations of the Complaint are just as meritless.

Plaintiffs allege that during the Phase II clinical trials of bapineuzumab Elan publicly stated that it and Wyeth would only commence Phase III trials if an interim review of data from an ongoing Phase II trial showed "strong" or "clinically meaningful" results.  Plaintiffs do not allege that these statements of intention (which precede the class period) were false, but instead claim that when Elan and Wyeth announced in May 2007 that they were starting Phase III trials, this amounted to a representation that the interim data were strong and clinically meaningful.  If this sounds like a dubious basis for a claim for securities fraud, that is because it is; as shown throughout this memorandum, there are many legal reasons why such a claim is not tenable.  The most glaring defect of this claim, however, is that the Complaint does not and cannot allege that the interim data were *not* strong and clinically meaningful.

The Complaint does not even allege what the data from the May 2007 interim review consisted of; these data were not disclosed because the ongoing Phase II trial remained blinded at the time of the May 2007 announcement.  Instead, the Complaint leaps to the erroneous conclusion that the interim data were the same as the final results of the Phase II trial, which were publicly presented at the International Conference on Alzheimer's Disease (ICAD) on July 29, 2008.  Nevertheless, even if the interim data were the same as the final results data arising out of the Phase II trial, plaintiffs' claim still would fail, for the simple reason that the final results of the Phase II trial for bapineuzumab were in fact strong and clinically meaningful (and "spectacular," although the Complaint attributes that word to Wyeth and not Elan).  Although the Phase II trial was designed primarily as a smaller safety trial and to gather information for the design of a potential larger Phase III trial, the Phase II trial yielded a compelling efficacy signal for bapineuzumab for a subgroup of patients constituting 40 to 70 percent of the Alzheimer's population.  For the first time ever, a promising drug for Alzheimer's disease showed signs of actually slowing the progression of the disease based upon clinical trial data – that is, a drug having a disease modifying effect, rather than just temporary relief of certain symptoms.  The clinical results were strong and clinically meaningful – and even spectacular – and plaintiffs cannot allege otherwise.

Plaintiffs' second attempt to allege a misrepresentation fares no better than the first.  The Complaint claims that Elan and Wyeth's press release of June 17, 2008 disclosing the "top-line" results of the completed Phase II trial was false and misleading because it did not contain the detailed results that were presented at ICAD on July 29, 2008.  This claim must fail because all the statements in the June 17, 2008 press release were completely accurate and correctly advised investors of the material results of the Phase II trial.

Elan and Wyeth announced in the Spring of 2008 that they had committed to provide a public presentation of the detailed results of the Phase II trial at ICAD in late July 2008.  ICAD, like most scientific conferences, imposes an embargo on data before it is presented at the conference, although a prior announcement of top-line results is permitted.  Accordingly, in compliance with the conference rule against disclosing full results, Elan and Wyeth disclosed the top-line results of the Phase II trial once such results became available.  Elan and Wyeth conveyed the top-line results in their June 17, 2008 press release, which contained the material information about the results of the trial and how these results drove Elan and Wyeth's next steps – including continuation of the Phase III trials, the timing of possible FDA approval, and the commercial potential of bapineuzumab.

*First*, the June 17, 2008 joint press release disclosed that the Phase II trial had *not* met its prespecified primary endpoints for efficacy in the total population.  Based on FDA regulations and practice, it was abundantly clear to the general public that Elan and Wyeth would not be able to file for FDA approval of bapineuzumab on the basis of the Phase II results, but instead would have to proceed forward and successfully complete Phase III trials.

*Second*, the press release disclosed that there were statistically significant efficacy signals in the large subset of Alzheimer's patients who are non-carriers of the ApolipoproteinE4 allele (a type of gene).  As disclosed in the press release, however, this effect was shown in "post hoc" analyses of the results, meaning that the study had not originally predefined efficacy in carriers of that allele versus non-carriers.  Although these were post hoc analyses and thus could not be used to prove efficacy which was required for FDA approval, these analyses were important

information about a disparate treatment effect on carriers and non-carriers, which could help better define bapineuzumab's clinical and commercial potential.  The analyses also supported the design of the Phase III trials, which stratified carriers and non-carriers.

*Third*, the press release disclosed important information about safety, including that, as compared to placebo, serious adverse events were more frequently seen in carriers versus non-carriers.  In addition, vasogenic edema (a kind of brain swelling) was reported in the treated population with an increased frequency in carriers and at higher doses.  This helped to further explain why the Phase III trials were stratified between carriers and non-carriers and why carriers were treated with a lower dose of the drug in the Phase III trials.

*Fourth*, the press release stated that the analyses of the results were "preliminary" and that the full results would be presented at ICAD on July 29, 2008.

*Fifth*, Elan and Wyeth stated in the press release that the Phase II results were "encouraging" and supported the previous decision to move to Phase III trials.  It was also recognized by both Elan and Wyeth that much work was left to be done, as noted by Wyeth's CEO in the release: "We recognize there is a great deal of hard work left as we move from this phase of learning towards confirming the potential of bapineuzumab."

Everything stated in the June 17, 2008 press release was absolutely true, and plaintiffs cannot allege otherwise.  On July 29, 2008, the full results of the Phase II trial were presented at ICAD, confirming the statements in the June 17, 2008 press release and providing additional details and analyses of the data – including other favorable results that had not been included in the press release.  However, the data were complex and dealt with effects of a novel biologic drug on a disease that is only partially and imperfectly understood.  Some instant analyses of the data by stock analysts and internet commentators interpreted some of the detailed results unfavorably, and the price of both Elan's American Depositary Receipts (ADRs) and Wyeth's stock declined on July 29, 2008.  Wyeth's stock price recovered within a few days, but Elan's ADRs fell sharply again on July 31, 2008, when two cases of a serious and rare disease were reported in patients taking Elan's primary marketed drug, Tysabri, which by some estimates

4

could reduce that drug's future revenue by half.

Given the absence of any misrepresentations by Elan, it is this decline in Elan's ADRs that essentially makes up Plaintiffs' entire case – even though any conclusions from it are seriously confounded by the Tysabri announcement two days later and even though the corresponding drop for Wyeth's stock proved to be nothing more than a temporary blip.  Cases based on just a stock drop are exactly what the PSLRA was intended to winnow out at the pleading stage.  Under the PSLRA, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," *i.e.*, an intent to defraud.  The Complaint simply cannot do this, and it fails utterly to meet the requirements of the PSLRA.  There was absolutely no reason for Elan and Wyeth to misrepresent data, and the Complaint alleges not even one fact that gives rise to a "strong inference" of fraudulent intent. Indeed, plaintiffs essentially throw in the towel on scienter when they speculate that Elan and Wyeth misrepresented data in order to mislead doctors and patients into enrolling in Phase III trials.  Plaintiffs allege no specific facts in support of such an implausible and harebrained scheme, but this allegation suffers from a more basic defect: the law requires an intent to defraud the plaintiff investors, not third parties.

The Complaint's allegations of scienter are also deficient under the standard set forth by the Supreme Court in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10 (2007), which requires a court to "consider plausible nonculpable explanations for the defendant's conduct" and instructs that a plaintiff's theory "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent."  Here, Elan and Wyeth had numerous scientific and business reasons that demonstrate their nonfraudulent intent.  Elan and Wyeth did not disclose or characterize the Phase II interim data when they announced the decision to proceed to Phase III in May 2007 for a simple and straightforward reason: the ongoing Phase II trial remained blinded, as was required to maintain the integrity of the trial.  Similarly, Elan and Wyeth did not include the detailed Phase II trial results when they announced the top-line results on June 17, 2008 because of the embargo on the

data imposed by ICAD and because they were proceeding according to a previously announced plan to have the analyses of the detailed results confirmed and presented at ICAD in late July. There is not even a plausible theory of an intent to defraud, much less a cogent and compelling one.

Plaintiffs' attempt to convert a stock drop into a securities fraud case would accomplish nothing more than to burden the drug development process with pointless and meritless litigation. This case should be dismissed now, without leave to amend.

**STATEMENT OF FACTS**

**A.     The Defendants**

Elan is incorporated in Ireland and has subsidiaries throughout the world, including the United States, where its biotechnology research and development operations are based. Elan is a neuroscience-based biotechnology company committed to innovations primarily in the therapeutic areas of autoimmune diseases and neurodegenerative diseases. ¶ 2; Ex. J at 13-14. Elan researched, developed, and markets the innovative blockbuster drug Tysabri, the most effective treatment for multiple sclerosis. ¶¶ 2, 86. Elan has arguably the world's leading portfolio of research and development programs for the prevention, cure, and treatment of Alzheimer's disease, as well as groundbreaking programs in other neurodegenerative diseases, including Parkinson's disease. Ex. J at 14-17.

Defendant Kelly Martin is the Chief Executive Officer of Elan. ¶ 25. Lars Ekman, M.D., Ph.D., was Elan's President of Research and Development until he resigned that position on December 31, 2007. ¶ 26. Currently, Dr. Ekman sits on Elan's Board of Directors and is the Chairman of the Board's Science and Technology Committee.

**B.     Elan's Scientific Approach To Treating Alzheimer's Disease**

Alzheimer's disease currently affects over 5 million people in the United States, and by 2010, there will be nearly half a million new cases of Alzheimer's each year as the "baby boomer" generation ages. Once symptoms of the disease become apparent, most patients can

expect to live an average of eight to ten years.  It causes anguish not only to its sufferers, but also to the millions of caregivers and family members who must cope with their loved ones' steady and irreversible decline.  It is indeed a "family" disease.  Alzheimer's also exacts a growing major toll on society, as costs associated with the disease, such as long-term medical care, home care, and lost productivity, amount to approximately $100 billion each year.  While medications approved by the FDA may temporarily address symptoms of the disease, none are known to stop or modify its progression.  The severity of Alzheimer's, the current lack of effective treatments, and the great emotional and societal toll it exacts on its sufferers and their care-givers places extremely high – and possibly unrealistic – expectations on Alzheimer's drug developers.[1]

Elan's scientists have been leaders in Alzheimer's disease research for more than two decades, and insights from their work have evolved the fundamental view of the disease.  Ex. J at 14.  Elan's several approaches to treating the disease focus on the beta amyloid hypothesis, which relates to plaques made of beta amyloid in the brain that are a hallmark pathology of Alzheimer's disease.  Ex. J at 14.  It is believed that the toxic effects of beta amyloid are likely responsible for the mental disruption characteristic of Alzheimer's disease, and that blocking the generation of beta amyloid in the brain or enhancing the clearance of beta amyloid from the brain will result in the successful treatment of Alzheimer's disease patients.  ¶ 29; Ex. J at 14-15.

### C.    Alzheimer's Immunotherapy Program (AIP) and Bapineuzumab

Elan pioneered an approach to treat Alzheimer's disease by inducing or activating the body's immune response in order to clear beta amyloid in the brain.  Elan has developed this approach in collaboration with Wyeth in a program known as the Alzheimer's Immunotherapy Program (AIP).  Ex. J at 14; Ex. JJ at 1.  The collaboration is governed by an agreement that generally provides that all material steps in AIP development activities would be upon the

---

[1]  *See* http://www.alz.org/national/documents/topicsheet_alzdisease.pdf; http://www.alz.org/national/documents/brochure_diagnosistreatment.pdf; http://www.alz.org/national/documents/topicsheet_2009_facts_figures.pdf.

agreement of both parties.[2]

The first candidate from the collaboration was an active vaccine known as AN-1792. AN-1792 showed great promise, but was discontinued in 2002 when a small subset of patients (6%) developed a type of brain inflammation. Ex. J at 15. Long-term follow-up data presented in 2007 found that 4.5 years after dosing had stopped, patients who had responded to treatment continued to show significantly slower decline on two key measures of cognitive function. Ex. J at 15. These results were a critical advance in Alzheimer's research. *See* Ex. O at 2 (analyst report noting that "a statistical benefit on a patient's cognition and function over 18 months has never been shown before in any mild to moderate Alzheimer's cohort in a clinical trial").

Based upon the proof of principle established by work on AN-1792, several programs emerged. Ex. J at 15. One of these is ACC-001, a vaccine currently in Phase II trials that is intended to induce a highly specific antibody response so that beta amyloid is cleared while minimizing side effects such as inflammation. Ex. J at 16. Another is bapineuzumab (also referred to as AAB-001), which is a humanized monoclonal antibody delivered intravenously; it is thought to bind to and clear beta amyloid peptide in the brain. ¶ 30. Bapineuzumab is referred to as "passive immunization," in that the infusion provides antibodies to beta amyloid directly to the patient, rather than requiring patients to mount their own immune responses, as seen with traditional active vaccines like AN-1792. Ex. C at 57; Ex. J at 15.[3]

---

[2]  This agreement was publicly disclosed as an exhibit to Elan's SEC filings. Ex. J at 214. It provides for joint decisions on all material steps in the drug development process, including clinical trials and review and approval of all filings with regulatory authorities. *See id*. §§ 3.1.1, 3.1.4. All press releases relating to the program were jointly reviewed and approved by Elan and Wyeth, and both companies coordinated on all aspects of the joint AIP program.

[3]  The immunotherapeutic approach to treating Alzheimer's disease (including Elan's involvement in it) is the subject of a documentary film which can be viewed at
http://www.hbo.com/alzheimers/supplementary-inflammation-the-immune-system-and-alzheimers.html.

**D.     The Drug Development Process: Clinical Trials and FDA Involvement and Review**

The development of a new drug requires extensive FDA oversight, and, on average, it takes twelve years for an experimental drug to proceed from the laboratory to a pharmacy.  *See Johnson v. Pozen Inc.*, 2009 WL 426235, at *3-4 (M.D.N.C. Feb. 19, 2009).  A drug is first subjected to pre-clinical laboratory testing to identify its mechanism of action and any notable safety risks.  Then, the FDA determines, based on an Investigational New Drug Application, whether it is reasonably safe to test the drug on humans.  21 C.F.R. § 312.20.  If human testing is approved, the FDA and a review board must approve trial protocols governing who may participate in the trial, the schedule of tests and procedures, and the study's objectives, or "endpoints."[4]

Clinical trials generally proceed in three phases, which progressively involve more patients and longer durations.  Phase I trials employ a small number of patients (around 20 to 80) to determine if there are any significant side effects and how the drug is metabolized.  *See In re Regeneron Pharm., Inc. Sec. Litig.*, 2005 WL 225288, at *2 (S.D.N.Y. Feb. 1, 2008); *Johnson*, 2009 WL 426235, at *3.  If the Phase I study does not reveal unacceptable side effects, and if the design of the next phase is approved by the FDA, a Phase II study is undertaken.  Phase II trials, which involve a few dozen to several hundred patients, seek to gather further safety data and preliminary evidence of the drug's efficacy across a range of possible doses.  *See* 21 C.F.R. § 312.21(2)(b); *Johnson*, at *3.

Once Phase II trials are complete, the results are presented to the FDA in a series of "end-

---

[4]   As described in *Cozzarelli v. Inspire Pharmaceuticals Inc.*, 549 F.3d 618, 621 (4th Cir. 2008), "[t]he FDA generally requires drug companies to conduct clinical trials with predetermined goals, or 'endpoints,' that must be satisfied."  The primary endpoint is, in effect, the main goal of a clinical trial; testing that meets this endpoint provides evidence that would support FDA approval.  Secondary endpoints provide further clinical information about a drug, but cannot, by themselves, provide convincing evidence of a clinically significant treatment effect.  *See, e.g., Bracco Diagnostics, Inc. v. Amersham Health, Inc.*, 627 F. Supp. 2d 384, 402 (D.N.J. 2009).

of-phase 2 meetings," whose purpose is to "determine the safety of proceeding to Phase 3, to evaluate the Phase 3 plan and protocols and the adequacy of current studies and . . . and to identify any additional information necessary to support a marketing application for the uses under investigation." 21 C.F.R. § 312.47 (b)(1). These meetings are thus important from both a regulatory and financial perspective and "should be held before major commitments of efforts and resources to specific Phase 3 tests are made." 21 C.F.R. §§ 312.47 (b)(1)(iii), (v).

Phase III trials test effectiveness and monitor side effects of selected doses in different and larger populations (sometimes several thousand), often over a substantially longer period of time. *See* 21 C.F.R. § 312.21(2)(c); *see also In re Regeneron*, 2005 WL 225288, at *3; *Johnson*, 2009 WL 426235, at *3. Phase III trials are generally referred to as "pivotal" trials, meaning that the trial results are used to determine whether the FDA will approve a new drug.

If the data from the Phase III trials demonstrate the drug's safety and effectiveness, the sponsor may file a New Drug Application ("NDA") with the FDA. *See In re Axonyx Sec. Litig.*, 2009 WL 812244, at *1 (S.D.N.Y. Mar. 27, 2009). If the NDA is approved, the drug can be marketed and sold. A drug's chance of making it through this process are slim. "[O]n average, only five in 5,000 compounds that enter pre-clinical testing ever make it to human testing," and "only one in every five drugs that makes it to human testing is ever approved." *Johnson*, 2009 WL 426235, at *3.

### E.   Phase I Clinical Trial of Bapineuzumab

Elan and Wyeth publicly disclosed the results of the Phase I trial of bapineuzumab at a scientific conference on April 20, 2006. Ex. B at 9. Although this small study (30 patients) was designed to assess safety, the results showed a statistically significant improvement in the Mini-Mental State Examination (MMSE)[5] in the 1.5 mg/kg dose group, a favorable treatment difference in the 0.5 mg/kg dose group, and no difference in the 5.0 mg/kg group. Three of the

---

[5]  The MMSE is a standard test for cognitive impairment, consisting of a list of 30 questions. For a description of the MMSE, *see* http://www.alz.org/alzheimers_disease_steps_to_diagnosis.asp.

patients in the highest dose group (5.0 mg/kg) developed transient MRI changes, and this dose was stopped.  Ex. B at 9.

F.      **Phase II Clinical Trial of Bapineuzumab**

Elan and Wyeth started the ELN-201 Phase II trial for bapineuzumab in 2005.[6]  As they disclosed, this was a multiple ascending dose trial which enrolled 240 patients.  ¶ 37.  The trial had multiple endpoints, including cognition (tested by Alzheimer's Disease Assessment Scale – Cognitive Subscale (ADAS-cog) and Neuropsychological Test Battery (NTB)) and function (tested by Clinical Dementia Rating Sum of Boxes (CDR-SB) and Disability Scale for Dementia (DAD)).[7]  ¶¶ 37, 50.  Approximately 95% of the patients in the trial, including those in the placebo arm, continued to receive "background therapies" representing the best standard of care in Alzheimer's disease.  These would include acetylcholinestrace inhibitors such as Aricept® and NMDA receptor antagonists such as Memantine®.  Ex. W at 6; Ex. X at 3.

Although the initial objective of the Phase II trial was to assess safety (Ex. E at 14), in 2006, following an interim review of the data with the FDA, the trial was deemed "fast tracked" and the primary endpoints were converted to efficacy endpoints, thus designating the Phase II trial as potentially "pivotal" by the FDA, *i.e.*, suitable for regulatory filing and review for potential approval.  ¶ 37; Ex. D at 4.  A "fast track" designation by the FDA allows accelerated approval of new biologic drugs that provide meaningful therapeutic benefit over existing treatments for serious or life-threatening illnesses.  21 C.F.R. subpart E, § 312.80 *et seq.*  A fast-track designation does not assure early approval, but instead sets up procedures for the

---

[6]  The ELN-201 trial is the Phase II trial at issue in this lawsuit.  Although there were other Phase II trials of bapineuzumab, the ELN-201 trial is referred to herein as "the Phase II trial" for ease of reference.

[7]  ADAS-cog is a complete assessment of cognitive function, measuring memory, language, executive function, and movement.  NTB consists of a doctor's assessment of a patient over time, and focuses on executive function and memory.  CDR-SoB rates cognitive impairment on a 5-point scale in six domains: memory, orientation, judgment and problem solving, function in the community, function at home, and hobbies and personal care.  DAD is scored based on a patient's caregiver assessing how the patient performs daily activities.  *See, e.g.*, Ex. U at 4; Ex. CC at 2-5 (analyst reports describing these tests).

heightened involvement of the FDA in the development and approval process. *See id.*

Because the Phase II trial could potentially be a pivotal trial in terms of supporting FDA approval, it was critically important to maintain the integrity of the data and the trial by keeping it blinded following any interim review of the data. ¶ 37. Elan and Wyeth agreed with the FDA on a method by which parts of the data could be looked at on an interim basis by a handful of selected individuals at the two companies to help design the Phase III trial, but without jeopardizing the overall integrity of the ongoing Phase II trial. ¶ 37; Ex. E at 8-9.

With regard to these interim "looks" at the Phase II data, Wyeth and Elan agreed upon certain specific criteria that would "need to be met in this Phase II trial in order to propel us into Phase III," although they did not disclose what the criteria were. ¶ 37; Ex. D at 4. On May 4, 2006, Elan disclosed that planned interim analyses of the Phase II data would be made in the second half of 2006 to determine if and when bapineuzumab could move to Phase III. ¶ 35; Ex. B at 9. Lars Ekman of Elan made clear that the data from the interim look would not need to reach statistical significance for Elan and Wyeth to decide to progress to Phase III trials:

> [Q]  And the last question, on the two parameters that you will decide to move forward, do you need statistical significance in those parameters or just a signal or a trend, given the fact there's only 50 patients in each [dose] group?
>
> [A]  We have said that we need a signal, a strong signal. The study is not powered for some of these endpoints. For some, it is powered, but for example for ADAS-Cog, you need more patients to have it powered up to 90% at the .005 [.05] level. If we get a signal at the .1 level, that's a strong signal in this patient cohort which will trigger a move.

Ex. A at 9-10.

On October 5, 2006, Wyeth held a conference call with financial analysts at which Bob Ruffolo of Wyeth discussed the Phase II trial. ¶ 36; Ex. C at 57. He did not have any data from the trial because it was blinded, but described possible future courses of action as follows:

> Now, again, we don't have any results from this study at all, but we have a planned interim look at the data at the end of this year. And, based on this interim look, we could do two things. One, depending on the data, we could advance directly into phase III in the first half of 2007, but the results would have to be spectacular. We don't know what results we're going to get.

Alternatively, we could complete the study and then move to the next interim look, which would be in the first half 2007.

Ex. C at 57-58.

As it happened, Elan and Wyeth did not enter Phase III based on the interim look in 2006, but instead continued with the Phase II trial. At a conference on January 9, 2007, Elan representatives discussed future interim looks:

> [Ekman]: We have defined a specific process by which we can in certain instances look at the data. As Kelly said, it's extremely controlled, because we have identified this trial as pivotal. That means we can't jump in and out of the data at our leisure, which you could if it was a non-pivotal Phase II study.
>
> We have also said that once we get positive data, we will inform the market. When you do these trials, it's a dose-escalation trial, so you start with the very low doses and then you move upward. And you start to look at the low doses at the shortest possible time and then you move upwards. And this is a trial that will continue through 2007 and during that time there will be interim looks.
>
> We have also jointly with Wyeth decided that we will not comment on when and how we're going to do the interim looks. We will inform the market when we have met the hurdles that we jointly set. And to paraphrase Bob Ruffolo, he said the data has to be – he used the word spectacular. I use the word it has to be strong, it has to be very meaningful.

¶ 37; Ex. D at 5-6.

### G.     Elan and Wyeth Decide To Commence Phase III Trials of Bapineuzumab

On May 21, 2007, Elan and Wyeth issued a joint press release announcing their decision to initiate a Phase III clinical program for bapineuzumab.  ¶ 39; Ex. F.  The release described the sources of information on which Elan and Wyeth based their decision, noting that "no conclusion about the Phase 2 study can be drawn until the study is completed and the final data are analyzed and released in 2008":

> This decision was based on the seriousness of the disease and the totality of what the companies have learned from their immunotherapy programs, including a scheduled Interim look at data from an ongoing Phase 2 study, which remains blinded.  No conclusion about the Phase 2 study can be drawn until the study is completed and the final data are analyzed and released in 2008.

¶ 39; Ex. F.  Elan and Wyeth disclosed as well the FDA involvement in the review of the data

and the review and approval of the Phase III trials:

> Phase 3 clinical trial design will be finalized with regulatory agencies, and subject to regulatory approval, it is intended for the trial to begin in the second half of 2007.

The press release stated that Elan and Wyeth did not expect that any Phase II data would be released publicly until the completion of the trial.  Ex. F.

On a July 26, 2007 earnings call, Dr. Ekman stated that Elan and Wyeth anticipated that a pre-Phrase III meeting with the FDA would take place soon (also referred to as an end of Phase II meeting, *see* section D, *supra*).  Ex. G at 5.  The FDA reviewed the Phase I and Phase II data and agreed that Elan and Wyeth could proceed to Phase III; the FDA also met with Elan and Wyeth to discuss and ultimately agree upon the design of the Phase III trials.  As Dr. Ekman explained in an earnings call on October 25, 2007:

> I will provide a brief update on the clinical and regulatory status of the impending phase three trial for Bapineuzumab.  In the regulatory arena, both the FDA and the CHMP [the Committee for Medicinal Products for Human Use of the European Medicines Agency] have agreed that the companies can proceed to phase three.  During the late September meetings, the FDA agreed, in principle to propose this trial design.  As part of this discussion, the FDA had the opportunity to review the data from AN-1792, the phase one data and the interim data from the current and ongoing phase two trial, all of which were relevant for the design of the phase three trial. . . .
>
> [The FDA] ha[s] seen all the data, relating to the safety of the drug, relating to the efficacy of the drug.  So we have shared all of the data from this – from that trial, from the phase one trial, and based on the totality of that, and our experience with 1792, we have designed a trial, and we have agreed with the trial design with the FDA.

Ex. I at 6, 12.

Elan's Form 20-F for 2007 described the Phase III trials, which had commenced with the dosing of the first patient in December 2007.  Ex. J at 15.  The Phase III program is conducted at 350 sites worldwide and includes four randomized, double-blinded, placebo controlled studies across two subpopulations, which are designed to total approximately 4,000 patients with mild to moderate Alzheimer's disease.  Ex. J at 15.  A notable feature of the Phase III trials is that they

stratify patients by ApolipoproteinE4 (ApoE4) genotype. Ex. J at 15. About 40 to 70 percent of

the Alzheimer's population are non-carriers of the ApoE4 allele, although carriers are more

likely to develop Alzheimer's than non-carriers. ¶ 7. The ApoE4 carriers would only receive the

0.5 mg/kg dose (the lowest dose in the trial), while the non-carriers are divided into three dose

cohorts, at 0.5 mg/kg, 1.0 mg/kg, and 2.0 mg/kg. Ex. K at 3. The patients are to be dosed for 18

months. Ex. I at 6. Elan was responsible for running the North American trials and Wyeth the

international trials. Ex. K at 13-14.

      The Phase III trials were an enormous investment for Elan and Wyeth, estimated to cost

more than $250 million. Ex. HH at 6-7. Elan's 2007 Form 20-F stated: "We have committed

significant resources to the development and the commercialization of Tysabri and to the other

potential products in our development pipeline (in particular, [bapineuzumab]) . . . If our Phase 2

and 3 clinical trials for [bapineuzumab] are not successfully completed, we will be materially

and adversely affected." ¶ 86; Ex. J at 5. It also warned of risks in the development process:

> Even if we obtain positive results from preclinical or clinical trials, we may not
> achieve the same success in future trials. Earlier stage trials are generally based
> on a limited number of patients and may, upon review, be revised or negated by
> authorities or by later stage clinical results. . . . Data obtained from preclinical and
> clinical activities are subject to varying interpretations, which may delay, limit or
> prevent regulatory approval.

Ex. J at 6.

### H.    Analysts' Speculation about the Phase II Data and Anticipation of the Release of the Phase II Top-Line Results and the Full Results at ICAD

      The data from the Phase II trial remained blinded as the trial continued through 2007 and

the first few months of 2008, but the Complaint cites analyst reports that expressed views about

what the data might reveal. On July 31, 2007, Natixis Bleichroeder published a report which

stated that "[s]ince Elan and Wyeth announced they were starting Phase III on bapineuzumab

after an interim look at its Phase II data in May, there has been much speculation as to how good

the data are, given that the trial is still blinded." ¶ 42; Ex. H at 1. Discussing Elan's Alzheimer's

programs in detail, the report opined, "[w]e think the data at the interim look must have been

profound and possibly involved a continual separation of drug from placebo over time –
indicative of true disease modification." ¶ 42; Ex. H at 1.  The report noted that Elan and Wyeth
had previously stated that the Phase II interim data would have to be "highly clinically relevant"
for them to proceed to Phase III, but "'[h]ighly clinically relevant' does not necessarily mean
statistically significant."  Ex H at 10.  It continued, "[w]ith so few patients per arm and the
inherently high standard deviations in these trials, we doubt that every dose reached statistical
significance on every endpoint – especially because it was an interim look."  *Id.*

      Natixis Bleichroeder issued another report on April 28, 2008.  ¶ 45; Ex. L.  It noted that
Elan "definitively stated that it will present the full data set from the bapineuzumab Phase II trial
at ICAD [International Conference on Alzheimer's Disease] at the end of July."  ¶ 45; Ex. L at 1.
"This signals to us that the end of the study is right on track to have top-line results put out in a
press release in June.  ICAD will impose an embargo on most of the data, but we believe Elan
will do its best to communicate that these results remove the majority of the risk of failure, and it
should be clear this is an approvable drug."  ¶ 45; Ex. L at 1.[8]  The report stated that the data
would not be "black and white" and that Elan would not be able to present all of the results in the
June press release because of the ICAD embargo:

> Wall Street usually prefers a simple black and white, yes/no answer, but, given
> the complexities of this drug, the trial, the disease, and the multiple endpoint, the
> black/white will be nearly impossible to achieve.  One will continue to need to
> look at the entire big picture to appreciate the potential.  It remains unclear how
> many numbers Elan will be able to disclose in a June press release . . .

Ex. L at 1.

      On May 1, 2008, Mr. Martin spoke at a Morgan Stanley conference. ¶ 46; Ex. M.  In his
responses to questions, Mr. Martin noted that Elan had stated that Elan and Wyeth wanted to see

---

[8]  *See, e.g.,* http://www.videnscenterfordemens.dk/siteDocs/objekter/130.pdf ("All materials to be
presented at the Alzheimer's Association International Conference on Alzheimer's Disease 2008
(Alzheimer's Association ICAD) are embargoed for publication and broadcast until the date and time of
presentation at ICAD, unless the Alzheimer's Association provides written notice of change of date/time
in advance").

"clinically meaningful" data to support the decision to proceed to Phase III and that the FDA had

supported the decision to proceed to Phase III before the completion of the Phase II trial:

> [Q] You guys have talked about in the past that you would go into Phase III, only
> really on the basis of really clinically meaningful and even spectacular data and
> you've also indicated possibly being able to file subpart E on the Phase II data,
> the final data.  I guess I'm trying to understand, what does that mean?  Those
> qualitative descriptions.  Does that mean we should expect statistical significance
> on Phase II?  Does that mean we should expect trends?  What exactly is
> spectacular?

> [A] Spectacular is probably in the eyes of the beholder, but what we said before
> we moved into Phase III, that we would need to see clinically meaningful data.
> We have looked at with Wyeth and ourself – when I say we, Wyeth and
> ourselves, we looked at all the immunotherapeutic information, going back to the
> original IA in 1792.  Looking at the Phase I data, looking at the interim Phase II
> data, et cetera.

> When we took an interim look, we clearly were looking for some specific things
> from a clinical point of view.  There was a number of end points that we were
> looking at.  We looked at it at a period of time that was still fairly early on in the
> Phase II.  So we both – we looked for both specific points and specific trends in
> certain things and we put that together and we had discussions with both the
> European agency and the U.S. agency, the collective decision was we should
> move to a Phase III, simultaneously.

¶ 46; Ex. M at 2.  Mr. Martin had not seen the full Phase II data (Ex. M at 3), and he responded

as follows with regard to the possibility of a filing for approval based on that data:

> We've kept the Phase II blinded because there is some chance, although again, as
> I've said to many people, it's not a high probability, but it is a probability.  Or
> some probability, that the – If the Phase II data is really spectacular that there
> could be some regulatory pathway to a filing that would be earlier than a full
> normal completion of Phase III.  That's going to depend, obviously on the data,
> it's going to depend on discussions with the regulator etc.

¶ 46; Ex. M at 2.

Mr. Martin also explained that once the full Phase II data became public Elan would like

"the marketplace and the investigators, the clinicians" to say they understood why Elan and

Wyeth started the Phase III trials when they did, and "it should be obvious why we moved to

Phase III and I think whether it's statistical significance in all or parts, supported by trends, or

trends with different combinations of data points." ¶ 46; Ex. M at 2, 3.  He explained, "I think

that the reason we moved to Phase III was we clearly saw enough data to move forward.  It's a

huge decision for us, and for Wyeth and it's one that we don't take lightly."  ¶ 46; Ex. M at 3.

Mr. Martin also stated:

> I also say to people, it would have been far easier for me, sitting here, to say we
> moved to Phase III and here's all the data.  Because for a year we've been trying
> to answer the questions in a way that's helpful for investors, but keep the Phase II
> pure.
>
> So, if you want to take it from that point of view, clearly we saw enough between
> Wyeth and ourselves and the agencies that, we have attempted, I think, pretty well
> to try to keep Phase II as blinded as possible and start to [sic] Phase III.

¶ 46; Ex. M at 4.

### I.    June 17, 2008 Announcement of the Top-Line Results for the Phase II Trial for Bapineuzumab

On June 17, 2008 Elan and Wyeth issued a joint press release containing the top-line

results for the Phase II trial of bapineuzumab.  ¶ 50; Ex. N.  Although the headlines for the press

release stated Elan and Wyeth's opinion that the top-line results were "encouraging," they also

specifically disclosed that the study had not met its primary efficacy endpoints:

> Elan and Wyeth Announce Encouraging Top-line Results from Phase 2 Clinical
> Trial of Bapineuzumab for Alzheimer's Disease
>
> Safety And Efficacy Findings Support Design Of Phase 3 Program
>
> Primary Efficacy Endpoints In Overall Study Population Not Statistically
> Significant
>
> Statistically Significant And Clinically Meaningful Benefits Seen In
> ApoE4 Non-Carriers
>
> Overall Results Support Prior Decision To Initiate Phase 3

*Id.*  Analyses that the press release described as "post hoc" showed "statistically significant and

clinically meaningful benefits in important subgroups" (specifically, non-carriers of the ApoE4

allele) "on several key efficacy endpoints," namely, ADAS-cog, NTB, MMSE, and CDR-SB.  *Id.*

On a fifth endpoint, the DAD, there was a favorable directional change but it was not statistically significant.  *Id.*  The preliminary evaluation of MRI results in non-carriers showed less loss of brain volume, which was statistically significant in a post hoc analysis.  Ex. N.[9]

As to safety, the press release disclosed that in non-carriers "the number of patients experiencing serious adverse events was similar between placebo and bapineuzumab-treated patients," while in carriers "serious adverse events were more frequently observed in bapineuzumab-treated patients than in placebo patients."  ¶ 50; Ex. N.  Vasogenic edema was reported in the treated population with an increased frequency in carriers and at higher doses.  *Id*.  In the Phase III studies, carriers were treated with a lower dose to minimize the risk of vasogenic edema.  *Id.*  Elan and Wyeth stated that they "believe[d] that the overall safety findings from this Phase 2 trial support[ed] their prior decision to move to Phase 3 studies."  *Id*.

The chief executive officers of Elan and Wyeth stated in the press release their opinions about the ramifications of the preliminary analyses of the Phase II results.  Mr. Martin of Elan stated that "the preliminary analyses of the Phase 2 study are a continued validation of the amyloid approach to Alzheimer's disease" and that they "clinically support our decision to move into Phase 3 last year."  *Id*.  Bernard Poussot, Wyeth's CEO, stated, "We are encouraged by these findings. . . .  We recognize there is a great deal of hard work left as we move from this phase of learning towards confirming the potential of bapineuzumab."  Ex. N.

The press release made clear that the analyses were preliminary: "These findings reflect preliminary analyses of the Phase 2 data and its implications for ongoing clinical development of bapineuzumab.  Further analysis will continue in advance of a planned scientific presentation of detailed results of this study at the International Conference on Alzheimer's Disease (ICAD) in

---

[9]  "Post hoc" analysis refers to looking at the data after the experiment has concluded for patterns that were not specified prior to undertaking the trial.  There is an obvious need for caution in interpreting post hoc analysis because, unlike a prespecified endpoint, in a post hoc analysis the hypothesis is created by the analysis and has not yet been proved through separate prospective testing.  Yet, because of its role in the generation of pertinent and useful hypotheses, post hoc analysis plays an important role in clinical trials.  In many instances, subgroup analysis findings present an important starting place for subsequent clinical trials to confirm or refute the finding, rather than being viewed as the definitive results.

Chicago, July 29, 2008."  Ex. N.  The press release also stated that in the trial "there were

imbalances in patient numbers and characteristics at baseline between subgroups studied that

may or may not have affected these results."  *Id.*

The press release contained several warnings in a section entitled "Safe Harbor/Forward

Looking Statements," including warnings relating to the interpretation of the top-line results:

> The statements in this press release regarding the Companies' preliminary, top-line assessment of the Phase 2 data and its implications for the Phase 3 program and future development of bapineuzumab are forward-looking statements that are subject to risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements.  In particular, these statements are subject to the risk that further analyses of the Phase 2 data may lead to different (including less favorable) interpretations of the data than the preliminary analyses conducted to date and/or may identify important implications of the Phase 2 data that are not reflected in these statements.  Clinical trial data are subject to differing interpretations, and regulatory agencies, medical and scientific experts and others may not share the Companies' views of the Phase 2 data or its implications for the Phase 3 program and future development of bapineuzumab.

Ex. N at 3.

### J.    Analyst Reports Discussing the Top-Line Phase II Results and Anticipating the Full Presentation of the Data at the ICAD Meeting on July 29, 2008

The Complaint quotes several analyst reports regarding the top-line results described in

the June 17, 2008 press release.  From these reports, it was clear that analysts understood the

limitations of post hoc analyses of clinical trial results and that Elan and Wyeth could not seek

approval of bapineuzumab on the basis of the Phase II results.

A June 17, 2008 Credit Suisse report stated that the top-line data "came with some

encouraging indications of efficacy this morning" in non-carriers.  ¶ 53; Ex. O at 1.  The report

noted it was a small trial "and the post hoc subgroup statistical analysis is weaker than

prospectively defined statistically analysis," but "some investors may gain more confidence that

the effects of AAB-001 on cognition seem robust."  *Id.*  The report noted the less positive aspects

of the results: "These positive observations must be balanced with the fact that within this small

trial this effect was not seen in the APOE4 carrier cohort and the primary efficacy end point for

the overall study population was not statistically significant." Ex. O at 1.

A June 17, 2008, Natixis Bleichroeder report stated that the press release contained "scant numbers" but "the data were very encouraging" (¶ 54; Ex. P at 1), "especially, given the dampening market expectations over the past several months." Ex. P at 1. The report noted, "We are fully aware that several key questions remain unanswered, and will remain so until the full data presentation at the ICAD meeting on July 29." *Id.* A June 18, 2008 Davy Research analyst report stated that in light of the better-than-expected data on efficacy, they were "Becoming more confident on development and commercial prospects for Bapineuzumab." ¶ 55; Ex. Q at 1. However, "Full data provision at ICAD will allow us to answer several more pertinent questions." ¶ 55; Ex. Q at 4. Similarly, a July 24, 2008, Stanford Group report set forth the questions they expected to be answered at ICAD. ¶ 57; Ex. S at 4.

On July 8, 2008, Cowen and Company published an analyst report entitled "Bapineuzumab Could be A Breakthrough . . . But Several Hurdles Remain." ¶ 56; Ex. R. Cowen observed that investors were looking to the ICAD conference for the full Phase II results:

> The complete bapineuzumab Phase II data set will be presented at the International Conference on Alzheimer's Disease (ICAD) meetings in Chicago on July 29th. Investors currently have mixed expectations regarding the robustness and the full Phase II dataset, so the data will be closely scrutinized.

Ex. R at 5. In the full results, they would be looking for "statistical details for the various efficacy measures at different time points" and "a graphical depiction of the cognitive and functional measurement trend lines through the course of the 18-month trial." *Id.* Cowen explained why it was very unlikely that Elan could file for FDA approval based on the Phase II data, in particular because the efficacy signals were only in post hoc analyses. *Id.* at 18-19.

On July 25, 2008, Natixis Bleichroeder published a report in which they noted the items they would be looking for in the data presented at ICAD. ¶ 58; Ex. T. Natixis predicted that "[t]here will undoubtedly be some controversy that some people will find to pick on. Statistics may be one of them." Ex. T at 1. The report also referred to a recent development that cast some doubt on the beta amyloid hypothesis, namely, an article in the previous week's *Lancet* on

the AN-1792 vaccine trial that "suggest[ed] that plaque clearance is not sufficient to halt disease progression and spooked the market." *Id.*

On July 28, 2008, Cowen published a report on "What To Look For In Tomorrow's Bapineuzumab Phase II Data Presentation." ¶ 60; Ex. U.  It stated: "Bapineuzumab has been the subject of tremendous speculation regarding the robustness of the Phase II efficacy results, the safety profile, and the odds of success in Phase III."  Ex. U at 1.  Cowen also pointed out publicly disclosed features of the Phase II trial that reduced the predictive power of its results:

> Our clinical consultants have note[d] that the predictive power of the bapineuzumab Phase II results will be reduced by several factors, including:  the post-hoc sub-group analysis; the relatively small patient numbers on active drug; the possible baseline imbalances in the cognitive and functional scores; and the inherent variability of the cognitive and functional measures as factors which reduce the power of the efficacy signal.

*Id.* at 3.

### K.     Presentation of the Results of the Phase II Trial at ICAD on July 29, 2008

On July 29, 2008, Dr. Sidney Gilman made a presentation at ICAD on the results of the Phase II trial of bapineuzumab, using slides that were placed on Elan's and Wyeth's websites. ¶ 63; Ex. W.  Dr. Gilman is the William J. Herdman Distinguished University Professor of Neurology, Director of Michigan Alzheimer's Disease Research Center, University of Michigan, a Fellow of the Royal College of Physicians, and Chair of the independent safety monitoring committee for the Phase II trial of bapineuzumab.  Ex. W at 3; Ex. V at 1.  On the same day, Elan and Wyeth issued a joint press release with the detailed results (¶ 61; Ex. V) and held a joint press conference to discuss them (¶ 62; Ex. X).  Mr. Martin, Dr. Ekman, and other high-level executives of Elan and Wyeth were in attendance at ICAD.  *See* Ex. X at 1.

The presentation of the data included encouraging detailed results that had not been referenced in the June 17, 2008 press release.  Even though the primary efficacy endpoints had not been reached in the total population, there had been a clear signal on two of the efficacy tests that just missed statistical significance.  A *p* value of 0.05 or less is generally considered to show

statistical significance, and the *p* value for the total population was 0.068 for the NTB and 0.078

for ADAS-cog.  Ex. W at 11.  As Dr. Allison Hulme of Elan observed at the July 29, 2008 press

conference, even though the "prespecified analysis . . . did not reach statistical significance in

that total population, . . . when we use the Phase II to really analyze what is going on in looking

at those data in full, our post hoc analysis clearly shows there were trends in the cognitive end

points of ADAS-cog and NTB in the total patient population before we subdivided those patients

into carriers and non-carriers."  Ex. X at 5.

     The detailed results also showed that in both the total population and the non-carriers,

there was an even greater treatment effect among the "completers," *i.e.,* the patients who had

received all of the doses over time in the trial.  Ex. W at 12; Ex. V at 2; Ex. X at 5.  This included

one particularly striking result in the non-carrier group, where the completers showed a 20-point

improvement over placebo on ADAS-cog, with a *p* value of .003.  Ex. W at 17.  The ICAD

presentation also quantified the encouraging findings on the reduction of loss in brain volume, as

a Credit Suisse report noted:

> Furthermore, the finding on the brain volume in non-carriers were relative [sic]
> large – over 1.1% reduction in brain volume over 18 months compared to placebo
> and these were correlated with the cognitive decreases seen in the non carriers.  If
> this is replicated in the larger studies in non carriers – bapineuzumab could be the
> first Alzheimer's treatment to have a potential reduction in cerebral atrophy claim.

Ex. CC at 5.

### L.     Decline in the Price of Elan's ADRs and Reactions of Commentators and Analysts

     The Complaint alleges that the price of Elan's ADRs dropped 42% on July 29, 2008 and

that this decline occurred because of certain matters described in the detailed results presented at

ICAD (discussed further in Section I.B.2. below).  ¶¶ 65-66.  Wyeth's stock price fell as well,

from $45.11 to $39.74 (a smaller percentage drop than Elan's, but a greater loss of market

capitalization).  Ex. KK.  By August 6, 2008, Wyeth's stock had gone back up, to $43.75.

Ex. KK.  Elan's stock did not.  On July 31, 2008, two days after the ICAD presentation, it was

announced that two patients taking Tysabri (Elan's primary marketed drug) developed a serious and sometimes fatal complication known as PML.  Ex. DD at 1.  Elan's stock dropped by approximately 50 percent, to $9.93, and did not recover as Wyeth's did.  ¶ 17; Ex. LL.  Tysabri had an eventful history (having been approved in November 2004, withdrawn from the market in February 2005, and returned to the market in September 2006 (¶ 2)), and investors appeared to react strongly to the news.

According to the Complaint, the June 17, 2008 press release was false and misleading because it did not include certain detailed Phase II results.  ¶ 52.  The Complaint quotes from analyst reports regarding some of these matters, as well as the opinions of internet commentators and even anonymous commenters on a website.  *See, e.g.*, ¶¶ 67, 74.  A commentator at TheStreet.com interpreted the data in a way to justify his previous position as a "very public bapineuzumab skeptic."  Ex. Y at 4.  Another emphasized the post hoc nature of the analyses (which had already been disclosed in the June 17 press release), noting the obvious point that they could not be "conclusively supportive of the efficacy" of bapineuzumab.  ¶ 70.  The Stanford Group report stated that an "accelerated FDA filing on interim analysis [is] unlikely" (¶ 71), although that fact had been previously made clear from the June 17 press release disclosing that the study had not met its prespecified efficacy endpoints.

Some of the cited reports and commentary express less favorable opinions about the significance of the data, but none of them indicate that the facts stated in the June 17, 2008 press release were false or misleading.  The only suggestion in the Complaint of a false statement by Elan are the anonymous website comments of a "Stanley W.", who complained that Mr. Martin had been "bullish" on bapineuzumab, without citing any statements by him.  ¶ 74.  Later commentary by "the very public bapineuzumab skeptic" claimed that Mr. Martin and his management team had "promised investors the sky and more" (¶ 82) but provided no specifics in support of this assertion.

Other analysts attempted to explain the stock price decline, noting that it did not appear warranted by the data presented.  For example, a July 30, 2008 Lehman Brothers report stated:

In our opinion, the full Phase 2 results support the top line data initially released in June, demonstrating biological activity & basis for advancing to Phase 3, which is currently underway.  We believe the after-market weakness (indicated in low $20s) in ELN shares is more a reflection of valuation having become overextended ahead of the data release &, to some degree, the double-edged sword of more data for investors to pick apart.  With time & greater understanding, we envision a more rational view will prevail, suggesting a more favorable risk/reward profile.

Ex. Z at 1.  A July 30, 2008 report from Leerink Swan made similar points:

> • **Bottom Line**: For its intended purpose, data from the Phase II trial of bapineuzumab in patients with mild to moderate Alzheimer's disease (AD) presented at ICAD yesterday support the notion that the trial was successful and provides intriguing proof of concept that broader clinical testing of beta amyloid-modulating therapies is warranted, in our opinion.
>
> • **We are making no changes to our valuation of ELN shares and view any weakness today as a buying opportunity.**
>
> • The harsh sell off in the stock that could occur today will likely be fueled by overblown expectations for the Phase II data and the difficulty in presenting a cogent analysis of a complex trial in a complex disease in a 12-minute presentation.
>
> • A MEDACorp consultant who was involved in the Phase II trial noted that data were reviewed over a two and a half hour period during an investigator's meeting night before last, speaking to the complexity of the data and the relative inability to distill it into an "elevator pitch."
>
> • To us, no new data emerged that causes us to revisit our thesis that bapineuzumab is effective, safe and worthy of advancing into large scale pivotal testing and could be a much-needed therapy for treating AD.

Ex. AA at 1 (emphasis in original).  A Goldman Sachs report of July 30, 2008 agreed that "Phase II Bapineuzumab data supports phase III early start" and that "investors have overlooked [] that these results are IN ADDITION to existing Alzhemier's [sic] Disease therapies.  In our view, that makes the data, albeit with its limitations, more compelling."  Ex. BB at 1 (emphasis in original).

The Complaint states that Mr. Martin "conceded" in Elan's October 23, 2008 earnings release that the "[t]he brief overview presentation of the Phase II data . . . at the International Conference on Alzheimer's Disease (ICAD). . . contributed to increased volatility in our equity

value and a change in the risk perception of Elan within the marketplace." ¶ 92; Ex. GG. Plaintiffs, however, omitted from that excerpt Mr. Martin's statement that another factor contributing to the volatility was "the emergence of two confirmed cases of progressive multifocal leukoencephalopathy (PML) with Tysabri." Ex. GG. Tysabri was and is Elan's primary marketed drug (¶ 2), and this development had a significant impact on Elan's anticipated revenues, and thus its share price. *See* Ex. DD at 1-3 (analyst report projecting that the news would cut Elan's expected revenues from Tysabri by almost half and discussing the impact of this on the value of Elan's shares).

More important, Mr. Martin's remarks in no way suggested that investors had been misled about bapineuzumab but instead focused on the fact that the "brief overview presentation" at ICAD resulted in misperceptions about the data. Mr. Martin explained this further at a Natixis Bleichroeder investor conference on October 13, 2008, the transcript of which is cited in the Complaint (¶ 88):

> I think it was a mistake which certainly I will take responsibility for on the Elan side to try to do this at ICAD. The ICAD meeting was a slot where you had 12 to 14 minutes to present data that was complicated in a disease that's not really well understood. . . . [T]he constituencies at ICAD ranged from Nobel Prize winning neurologists, clinicians, to sell-side analysts and investors and media, so the audience was extremely mixed and the audience was all looking for slightly different things in 12 minutes . . .
>
> We've had meetings under CDA [Confidential Disclosure Agreements] with handfuls of neurologists around the world to go through the immunotherapeutic data and on average those meetings take five hours. . . . Those meetings – if I can just sort of describe them by the end of the meeting, they are constructive meetings . . .
>
> So I think in general, everybody want to look for pristine simplicity, which was not in fact what everyone got. Everyone got a piece, a small picture of a much more complex set of data . . .

Ex. EE at 5.

**M.     Post-ICAD Events**

On October 22, 2008, Wyeth disclosed in its analyst call that certain European regulators had delayed enrollment in the Phase III trials that Wyeth was conducting in Europe because the regulators wanted to further review and consider the Phase II data and the Phase III protocols. ¶ 78; Ex. FF at 7, 10.  The Complaint alleges that this shows that Elan and Wyeth's statement that "Phase 2 data reinforces the design of the ongoing Phase 3 studies" was false because "[i]n fact, the Phase 2 Study data caused a significant delay in those studies."  ¶ 77.

On September 17, 2009 Elan announced the closing of a transaction with Johnson & Johnson by which J&J acquired a 51% interest in Elan's 50% share of the AIP (including bapineuzumab) for approximately $885 million and agreed to pay an additional $500 million in AIP development expenses.  Ex. JJ.  In 2009, Pfizer acquired Wyeth for $68 billion and cited bapineuzumab as one of the highlights of that acquisition.  Ex. II.  Both transactions validated the beta amyloid hypothesis for Alzheimer's disease and the value of the bapineuzumab program.

## ARGUMENT

To state a claim for securities fraud under section 10(b) of the Securities Exchange Act of 1934, a plaintiff must allege that defendants "(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *Lentell v. Merrill Lynch & Co., Inc.*, 396 F.3d 161, 172 (2d Cir. 2005).

In a motion to dismiss under Rule 12(b)(6), only well-pleaded facts contained in the complaint may be presumed to be true.  *See In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 404 (S.D.N.Y. 2001).  A complaint must plead "[f]actual allegations . . . to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint . . . has not shown that the pleader is entitled to relief."

*Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009).  To survive a motion to dismiss, a complaint must contain factual allegations that "state a claim to relief that is plausible on its face."  *Id.* at 1949 (citing *Twombly* at 570).[10]  "The Court need not credit conclusory statements unsupported by assertions of fact or legal conclusions and characterizations presented as factual allegations." *In re Livent*, 151 F. Supp. 2d at 404 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)).  The Complaint consistently violates every one of these rules.

I.    **THE COMPLAINT DOES NOT AND CANNOT ADEQUATELY ALLEGE THAT DEFENDANTS MADE ANY FALSE OR MISLEADING STATEMENTS**

A securities fraud complaint must contain well-pleaded facts that set forth with particularity what statements were false and why they were false when made.  *See, e.g., Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) (1997)).  "Because only a fraction of financial deteriorations [at public companies] reflects fraud . . . plaintiffs in securities cases must provide enough information about the underlying facts to distinguish their claims from those of disgruntled investors."  *See, e.g., In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1169-70 (N.D. Ill. 2004) (quoting *Arazie v. Mullane*, 2 F.3d 1456, 1458 (7th Cir. 1993) (internal quotations omitted)).

A.    **Elan's Statements Regarding the Commencement of the Phase III Trials Were Not False or Misleading**

The Complaint alleges that Elan made actionable misrepresentations when Elan and Wyeth announced their decision in May 2007 to commence Phase III clinical trials of bapineuzumab because Elan had previously stated that Elan and Wyeth only intended to do so if

---

[10]  On a motion to dismiss, the court may consider all documents referenced in the complaint, all SEC filings and other public documents, whether or not referenced in the complaint, and all documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit.  *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir. 1991); *Kramer v. Time Warner Inc.*, 937 F.2d 767, 773-74 (2d Cir. 1991).  If allegations in the complaint are contradicted by documents made part thereof or referred to therein, the documents control.  *Olkey v. Hyperion 1999 Term Trust, Inc.*, 98 F.3d 2, 9 (2d Cir. 1996); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991).

the data from an interim review of the Phase II trial met certain criteria and were "strong" and "clinically meaningful" (and "spectacular," although the specific allegations of the Complaint attribute that word to Wyeth, not Elan).  ¶¶ 39, 43, 46, 47.  Plaintiffs claim that the interim Phase II data did not meet these standards.  This claim should be dismissed for the reasons discussed below.

>    **1.    There Are No Adequate Allegations That the Data from the 2007 Interim Review of the Phase II Trial Were Not "Strong" and "Meaningful" or Even "Spectacular"**

Plaintiffs' claim must fail because there is no sufficient allegation (nor can there be) that the Phase II data seen on the interim review in 2007 were not meaningful, strong, or even spectacular.  Plaintiffs state that the data from the interim review were a failure (¶¶ 7-10) and were not spectacular or strong (¶ 7), without alleging facts that explain how or why.

Alzheimer's is a terrible disease for which no cure exists.  It leads inexorably to severe dementia and death.  Although there are some drugs that provide temporary symptomatic relief, there is no drug on the market that even slows the rate of decline.  A drug that showed a positive effect in slowing the rate of decline in a subgroup of patients comprising forty to seventy percent of the Alzheimer's population could fairly be described as strong, meaningful, or spectacular.

In any event, the Complaint fails to adequately allege otherwise.  Plaintiffs claim that bapineuzumab "failed" the interim review because the final Phase II results showed that the trial failed to meet its primary efficacy endpoints, namely, that bapineuzumab outperform placebo in a statistically significant manner on the ADAS-cog and DAD tests.  ¶ 7.  There is, however, no allegation in the Complaint that meeting the primary efficacy endpoints for the trial was the standard Elan and Wyeth intended to use in the interim review in order to determine whether to proceed to Phase III (and Elan and Wyeth never made such a representation).  Without referencing any public statements or any other source, the Complaint alleges that "[i]n order to assess bapineuzumab in the interim review, Elan and Wyeth agreed to use the two primary tests used in the study," the ADAS-cog and the DAD.  ¶ 5.  But even if those tests were to be "used"

in the interim review, that does not mean that obtaining statistical significance in the tests was the criterion to be applied in the review.  To the contrary, Elan could not possibly have calculated statistical significance at the time of the interim look, as this was a sequential dosing trial (meaning that each of the dose groups started at a different time, and thus at the interim look were at different stages of the trial).  Furthermore, the Complaint's allegations indicate that endpoints in addition to ADAS-cog and DAD were considered as well.  ¶ 50; Ex. M at 2.

The Complaint also claims, without factual support, that bapineuzumab failed the interim review because the final results of the trial showed that higher doses of the drug were associated with vasogenic edema in patients who were ApoE4 carriers.  ¶ 7.  There is no allegation in the Complaint, however, that this meant that the trial was a failure, much less that it did not meet the criteria for the interim review of the Phase II data.

Plaintiffs claim that the data from the interim review were not strong or meaningful because the final Phase II results "meant that Phase 3 trials would likely have to run their full 18-month courses before FDA approval would be possible" which would "reduce[] the then-present value of bapineuzumab."  ¶ 66.  But whether this is correct has no bearing on the issue of whether the actual trial data were strong or clinically meaningful.  They were, and plaintiffs are unable to allege otherwise.

### 2.     The May 21, 2007 Announcement Clearly Articulated Elan and Wyeth's Rationale for Starting the Phase III Trials

The Complaint's reliance on prior statements of what Elan and Wyeth intended to do with respect to the commencement of the Phase III trials is misplaced because Elan and Wyeth clearly articulated their rationale for starting the Phase III trials in their May 21, 2007 press release.  The first paragraph of the press release states:

> This decision was based on the seriousness of the disease and the totality of what the companies have learned from their immunotherapy programs, including a scheduled Interim look at data from an ongoing Phase 2 study, which remains blinded.  No conclusion about the Phase 2 study can be drawn until the study is completed and the final data are analyzed and released in 2008.

¶ 39.  This press release definitively told investors that the decision to proceed to Phase III was not based solely on the interim data from the Phase II study, but that it was also based on the seriousness of Alzheimer's disease and on all the information Elan and Wyeth had learned from their previous work on the disease and the prior AN-1792 immunotherapy program.  The second sentence made clear that investors should not draw any conclusions about the Phase II results at that time; indeed, Elan repeatedly advised investors that because the trial remained blinded, Elan and Wyeth were not disclosing any of the results.

Thus, the current disclosures existing at the time of the announcement of the decision to commence Phase III trials (and the start of the class period) were that no definitive conclusions should be drawn from the Phase II interim data.  Under these circumstances, the earlier statements could not have remained alive in the mind of a reasonable investor.  Similarly, Mr. Martin's comments at the May 1, 2008 conference, while noting the previous statements that Elan and Wyeth had wanted to see "clinically meaningful" data from the interim review, made clear that this did not necessarily mean statistical significance.  Mr. Martin also stated that he could not discuss the Phase II data except to say that it should be obvious why Elan and Wyeth had proceeded to Phase III when they did.  *See* Section H, *supra*.  These statements were all correct and are not actionable.

3.    **Elan Had No Duty To Update Investors Regarding Its Phase III Plans, Particularly in Light of the Vague and Inexact Statements of Intention at Issue**

Plaintiffs do not allege that Elan or Wyeth misrepresented their intentions with regard to the decision to commence the Phase III trials.  Instead, the Complaint's allegation appears to be that Elan and Wyeth changed their minds after making these initial statements and decided to commence Phase III on the basis of supposedly less impressive Phase II trial interim data.  But even if this were the case, deciding to go forward with Phase III based on different data would be insufficient to state a claim under the securities laws because there was no duty to update in the circumstances presented here.

31

In the Second Circuit, courts will only consider imposing a duty to update in instances where a definitive, material statement becomes incorrect.  For example, in *In re International Business Machines Corporate Securities Litigation*, 163 F.3d 102, 110 (2d Cir. 1998), the court held that no duty to update existed where IBM repeatedly made statements to analysts and reporters that it did not plan to cut its dividend, but in fact did so within a few months.  Because the statements were expressions of opinion, they were not sufficiently concrete to require updating.  Similarly, in *In re Time Warner Inc. Securities Litigation*, 9 F.3d 259 (2d Cir. 1993), despite the fact that defendants had disclosed a plan to finance debt through strategic partnerships, the company ultimately pursued a public offering to raise funds, substantially diluting the shareholders' interests.  There was no duty to update because the statements concerning the financing plans "lack[ed] the sort of definite positive projections that might require later correction."  *Id.* at 267.

Elan's statements were not "definite positive projections."  On the contrary, words like "spectacular" and "strong" are consistently found not to be material or concrete enough to require updating.  *See Elliot Assocs., L.P., v. Covance, Inc.*, 2000 WL 1752848, at *10 (S.D.N.Y. Nov. 28, 2000) ("challenged statements are vague expressions of opinion which are not sufficiently concrete, specific or material to impose a duty to update").  In *In re Bristol-Meyers Squibb Securities Litigation*, the court held that defendants' alleged misstatements about the prospects of their drug Erbitux – which included statements such as "Erbitux [has] real blockbuster potential, has the potential to be one of the most exciting, if not the most exciting, oncology compound introduced over the next several years" – were "in all relevant respects identical to those that the Court of Appeals has repeatedly held to be nonactionable expressions of corporate optimism."  312 F. Supp. 2d 549, 557 (S.D.N.Y. 2004).  The court in *Noble Asset Management v. Allos Therapeutics, Inc.*, held that descriptions of clinical trial results as "strong," "compelling," "impressive," and "positive" were immaterial puffery, even though the drug was ultimately not approved by the FDA.  2005 WL 4161977, at *11 (D. Colo. Oct. 20, 2005).

The same holds true in cases outside the context of pharmaceuticals and clinical trials.

In *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Co.*, the Second Circuit held that certain statements were non-actionable puffery, including that the company was "expecting a strong year," "Marlboro is still very strong in the face of very low pricing," "the tobacco business is strong and growing," and "We expect 1993 to mark another year of strong growth in earnings per share."  75 F.3d 801, 806-07, 811 (2d Cir. 1996); *see also In re Xinhua Finance Media, Ltd. Sec. Litig.*, 2009 WL 464934, at *8 (S.D.N.Y. Feb. 25, 2009) ("strong" is a "soft adjective" and is "nothing more than puffery, which is not actionable under the securities laws"); *Pollio v. MF Global, Ltd.*, 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) (statements that results were "strong" and that company was "stronger" are "generalized expressions of puffery and optimism" that are "are not actionable under the securities laws") (internal citations omitted). Similarly, statements concerning future earnings and sales goals and a company's desire to achieve continued prosperity were the sort of "predictive statements of opinion and belief that courts have found immaterial" and "are not considered seriously by the marketplace and investors in assessing a potential investment."  *Lasker v. N.Y. State Elec. & Gas Corp.*, 85 F.3d 55, 58-59 (2d Cir. 1996) (internal quotation marks omitted); *see also San Leandro*, 75 F.3d at 811 (statements of hope, opinion, or belief about future performance not actionable).

### B.     Elan and Wyeth's Statements Regarding the Top-Line Phase II Results Were Not False or Misleading

Plaintiffs allege that Elan and Wyeth's June 17, 2008 press release, in which Elan and Wyeth announced the top-line results of the Phase II trial, was false and misleading because it did not contain the detailed information concerning the results that was presented at the ICAD meeting six weeks later, on July 29, 2008.  ¶¶ 13-14.  This claim has no merit.

"[E]ven material omissions cannot form the basis for a securities fraud claim absent a duty to disclose that information."  *In re Adolor Corp.*, 616 F. Supp. 2d 551, 569 (E.D. Pa. 2009); *see also In re Time Warner*, 9 F.3d at 267.  Where, as here, a plaintiff claims a violation of Section 10(b) on the basis of omissions where there was no generalized duty to disclose, the complaint must allege, with particularity, that the defendant "omitted to state a material fact

necessary in order to make the statements made, in the light of the circumstances in which they were made, not misleading . . . .” *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir. 2000) (quoting 15 U.S.C. § 78u-4(b)(1) (1997)).  The Complaint fails to do this.

### 1.    The June 17, 2008 Press Release Was Not Misleading

Plaintiffs allege that the June 17, 2008 press release was misleading because although it announced the top-line results of the Phase II clinical trial, it did not disclose certain detailed findings from the study.  But as Elan and Wyeth made clear, the press release was not intended as a comprehensive report on all study findings; it was instead a statement of the “top-line” results and advised that the presentation of the full study results would be made at ICAD.  The press release stated that it “reflect[ed] preliminary analysis” and that further analysis would be completed prior to the “presentation of detailed results” at ICAD.  Ex. N at 2.  Because of the ICAD embargo on the data, the full results of the Phase II trial could not be publicly disclosed in advance of the conference on July 29, 2008.  *See* Section H, *supra*.

Regarding the trial’s overall efficacy findings, the press release could not have been clearer: “The study did not attain statistical significance on the primary endpoints in the overall study population.”  Ex. N at 1.  That the primary efficacy endpoints were not met made it clear that bapineuzumab would not be filed for FDA review and possible approval on the basis of the Phase II efficacy data.  *See, e.g.*, Ex. R at 18-19.  But as the press release also disclosed, “Post-hoc analyses did show statistically significant and clinically meaningful benefits in important subgroups.”  Ex. N at 1.  The release also set forth safety information, including the increased risk of vasogenic edema among carriers and at the higher doses.  Ex. N at 2.

Plaintiffs take issue not with what the press release says, but with other pieces of information that they allege should have been included in it.  But the alleged “omissions” did not cause the press release to be misleading.  So long as “a company provide[s] complete and accurate information, this does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only that such others, if

any, that are needed so that what was revealed would not be so incomplete as to mislead." *In re Biogen Sec. Litig.*, 179 F.R.D. 25, 39 (D. Mass 1997) (internal quotation marks omitted).

There are many other examples of pharmaceutical companies releasing some, but not all, information about their clinical trials, without making the disclosures false or misleading. For example, in *In re Adolor Corp.*, the plaintiffs alleged that although the defendants had released information regarding the top-line results from their clinical trial, they omitted relevant information about the performance of various subgroups of patients. 616 F. Supp. 2d 551, 569-70 (E.D. Pa. May 8, 2009). The court found that, regardless of whether the subgroup information was material, "[d]efendants were under no obligation to disclose" the subgroup information where company officials advised investors that they would only disclose the subgroup information at a later time when all the Phase III studies had been completed, never did anything to create the impression that results were consistent across subgroups, and repeatedly warned investors not to draw any final conclusions until all studies were completed.

In *Padnes v. Scios Nova, Inc.*, plaintiffs alleged that, although the defendant's summaries regarding the results of a drug trial were factually accurate, they were misleading because the company did not disclose alleged "design defects" in the study. The court held that the defendants had no duty to reveal such information:

> Defendants, like any other company wishing to publicly discuss the results of a scientific study, had to make a judgment as to which specific bits of information about the study and its conclusions to disclose. With the advantage of hindsight, defendants' judgment as to which information to disclose is subject to challenge; however, this does not amount to facts explaining why the difference between the earlier and later statements is not merely the difference between two permissible judgments, but rather the result of a falsehood.

1996 WL 539711, at *5 (N.D. Cal. Sept. 18, 1996) (citation and quotation marks omitted).

## 2. The Detailed Results of the Phase II Trial Were Not Required To Be Included in the June 17, 2008 Press Release

Plaintiffs allege the June 17, 2008 press release was false and misleading because Elan and Wyeth did not include in it the detailed results of the Phase II trial, including that there was

(a) no dose response; (b) a larger than expected decline among the placebo group; (c) a change in statistical model post hoc from linear to curvilinear; (d) no short term advantage for bapineuzumab over placebo; (e) no significant results in the MMSE testing; (f) vasogenic edema in 10 percent of patients; (g) three deaths; (h) nine additional adverse effects, including anxiety, vomiting, hypertension, paranoia, skin laceration, gait disturbance, and muscle spasms; and (i) a failure to show a statistically significant benefit compared to placebo per the original trial protocol by a "large margin." ¶ 14. These matters were not material and their non-inclusion in the June 17 press release did not render it false or misleading.

### a.      No dose response shown

The Complaint alleges that the press release should have disclosed that in non-carriers, the post hoc analyses did not show a correlation between the dose amount and the amount of improvement in the patient. ¶ 52. But the press release did not assert otherwise. It did not address dose response at all, either in terms of the amount of each dose (as to which there was no conclusive result) or the amount of bapineuzumab received over time (for the "completers" who received all doses, as to which there were results showing an even greater improvement over placebo in both non-carriers and the total population). *See* Ex. W at 10, 12, 17.

Elan and Wyeth did not consider the lack of an indication of a dose response in the non-carrier group to be of particular significance given the constraints of the study and the nature of the drug and the disease. The size of the four dose cohorts among the non-carriers in the study was so small that it was unlikely a dose response would be shown. Ex. X at 5, 6. As Dr. Hulme of Elan stated at the July 29, 2008 press conference: "The numbers, once we went into that non-carrier patient population I just shared, are very small when you then go into the individual dose cohorts. And that is why we focus on the combining [of] all of those dose cohorts together and giving the all versus all. . . . Some of them are less than 10 patients in some of those sub groups." Ex. X at 15. Dr. Hulme further explained Elan and Wyeth's analysis of this issue:

> It's very difficult with the numbers that we've got in each of those dose cohorts to
> really pay a huge amount of attention to individual groups and how they respond

on the various outcome measures.  That's why we really focus back to the all dose
groups, particularly when we go into those sub populations of non-carriers and
carriers.  Where we're really reassured is that when we look at that total patient
population, both the MITT ["modified intent to treat," referring to all patients in
the study who received at least one dose and were evaluated at least once, *see*
Ex. X at 4] analysis where we saw the trends on the ADAS-cog and the NTB, and
then when we look at those patients that got the drug as we designed it to do and
we look at all of the doses versus all of the placebo in that population, you see
very robust data in terms of changes in both ADAS-cog, NTB, DAD and CDR
sum of boxes.  So we're not going to be swayed by one individual dose cohort
that doesn't behave typical with the other dose cohorts.  We combine them into all
doses.

Ex. X at 7.

    A Credit Suisse report cited in the Complaint (¶ 72) stated that the apparent lack of a dose

response was "confusing," but explained why it did not indicate a lack of efficacy:

> Whilst we agree that the lack of apparent dose response is confusing – we note
> that Alzheimer's is a heterogeneous disease and how individual patients respond
> to differing concentrations which may or may not remove amyloid at different
> rates is unknown.  What may give some more confidence that the effect of drug is
> real – is that in the completer groups for the total population (78 drug Vs 78
> placebo) above baseline responses were presented in each individual doses on
> ADAS Cog – and the average of all dose response was statistically significant
> compared to placebo on ADAS cog, NTB and the DAD score.  We believe that
> there were too few patients in this study to make meaningful comparisons
> between individual doses – powering in Phase III should help in this regard.

Ex. CC at 2.  A Goldman Sachs report reached the same conclusion.  Ex. BB at 1.

    In any event, many effective and approved drugs do not have a dose response based on

the amount of each dose.  *See, e.g.,* Ex. MM (Fairooz Kabbinavar, et al., *Phase II, Randomized*

*Trial Comparing Bevacizumab Plus Fluorouracil (FU)/Leucovorin (LV) With FU/LV Alone in*

*Patients With Metastatic Colorectal Cancer*, J Clin Oncol 21:60-65 (2003) (in Phase II trial for

blockbuster cancer drug Avastin, "[t]he reason why the lower dose . . . seemed to be more

effective than the higher dose in this study is unclear")).  Biologic drugs, in particular, tend to

work in highly patient-specific ways, and there is therefore even less reason to assume that they

would have a dose response based on the amount of each dose.  That a dose response was not

shown in the study was not a material fact and was not required to be disclosed.  *See Johnson v.*

*Pozen*, 2009 WL 426235, at *20 (M.D.N.C. Feb. 19, 2009) (holding that, where plaintiffs failed to allege that positive genotoxicity results prohibited FDA approval, plaintiffs' assertions that those results were a material fact required to be disclosed were "entitled to no weight").[11]

### b.   "Larger than expected" decline in the placebo group

The Complaint alleges that there was a "larger than expected" decline in the placebo group, but does not say whose expectations it is referring to and it does not allege that it rendered the statistical conclusions inaccurate.  Elan and Wyeth had no control over the rate of decline of the placebo group and there is no allegation that the results from that group were improperly influenced or recorded in the trial.

The "expectations" referred to in the Complaint are subjective, and others with more knowledge and information would disagree with plaintiffs' conclusion.  At the press conference on July 29, 2008, Dr. Gilman and Ron Black (Wyeth's Assistant Vice President, Neuroscience) disagreed that the decline in the placebo group was unusual, citing the results of other recent studies.  Ex. X at 9.  As Dr. Gilman stated, "[t]his is not unusual" and was within the standard deviation.  *Id*.  *See also* Ex. W at 20 (Dr. Gilman distinguishing the decline in a placebo group in a dissimilar study).[12]  *See, e.g., Noble*, 2005 WL 4161977 at *11 (where plaintiffs alleged that

---

[11]  A number of other currently marketed biologic drugs and Alzheimer's drugs have shown no dose response.  In Phase II trials for the lymphoma biologic drug Rituxan, there was no difference in efficacy between the two doses included in the clinical trial.  *Rituximab (Anti-CD2O Monoclonal Antibody) for the Treatment of Patients With Relapsing or Refractory Aggressive Lymphoma: A Multicenter Phase II Study*, Blood. Vol 92, No 6 (September 15) 1998: pp 1927-1932; *see also* Winkinson, et al., *Galantamine: a randomized, double-blind, dose comparison in patients with Alzheimer's disease*, International Journal of Geriatric Psychiatry 2001, 852-857 (in clinical trial of Alzheimer's disease biologic drug, lower dose showed better efficacy than higher dose).  Ex. MM.

[12]  The ADAS-cog scores for the placebo patients in the bapineuzumab Phase II trial dropped 11 points (¶ 65(b)), which is similar to the findings of other studies.  *See* RG Stern, RC Mohs, M Davidson, J Schmeidler, J Silverman, E Kramer-Ginsberg, T Searcey, L Bierer, and KL Davis, *A longitudinal study of Alzheimer's disease: measurement, rate, and predictors of cognitive deterioration*, Am J Psychiatry 1994, 151: 390-396 (decline of 9-11 points per year shown).  One recent study analyzed the placebo effects of various Alzheimer's disease trials (including the bapineuzumab Phase II trial) and showed that the placebo effect of the bapineuzumab trial was not significantly higher than the average.  Schneider, L. & Sano, M., *Current Alzheimer's disease clinical trials: Methods and placebo outcomes*, Alzheimer's & Dementia 2009, Vol. 5, Issue 5, 388-397.  Ex. MM.

defendants' statements about their post hoc interpretation of the data were misleading on account of the methodology utilized, the court held that where the facts demonstrated that reasonable minds might differ on the interpretation of the data, plaintiffs failed to allege a misstatement) (citing *Padnes*, 1996 WL 539711, at *5).

> **c.    Use of a curvilinear statistical model in the post hoc analyses**

The Phase II trial, commenced in 2005, had a prespecified efficacy endpoint that called for the use of a statistical model that assumed a linear decline in Alzheimer's patients over time. Ex. W at 9.  It turned out that the data did not behave that way, and the decline was not linear. *Id.*  In other words, the patients' decline was not constant over time, and instead the patients generally declined slightly during the beginning of the trial, but then declined very quickly later in the trial.  Thus, instead of the decline appearing as a straight line on the chart (linear), it was a downward curve (curvilinear).  Accordingly, in their post hoc analyses, Elan and Wyeth used a curvilinear statistical model to better conform to the data from the study.  As Dr. Hulme explained:

> The model also assumed linearity with type.  As you know, we did not achieve statistical significance on the prespecified end points of ADAS-cog and DAD. We also learned when we unblinded the study that the data did not decline in a linear fashion with time.  For having not achieved statistical significance on our prespecified end point, we moved on to the post hoc analyses with the study.

Ex. X at 4.  Elan and Wyeth had announced on June 17 that the study had failed to meet its prespecified endpoints and that the subgroup analyses that showed statistical significance were post hoc.  There was no reason to use a statistical model that did not conform to the data simply because it was the model to be used in an analysis that Elan and Wyeth had already announced the study did not meet.

The Complaint cites a July 31, 2008 Credit Suisse report as stating that the "transition from a linear analysis to a non linear analysis for the Post Hoc analysis weakens findings."  ¶ 72; Ex. CC at 3.  In fact, however, the Credit Suisse report simply stated that proposition in order to respond to it.  Ex. CC at 2.  As it explained, the non-linear decline correlated with the rate of

decline in brain volume and was also seen in another study presented at ICAD:

> We agree that this transition was not communicated well to the market.  The
> group found that patient's cognitive decline was not linear but more parabolic –
> and interestingly this parabolic decline was also correlated with the brain volume
> loss decline.  There may be independent evidence of this when noting
> observations of a separate study by Professor Schneider who also presented on the
> same night a study which showed an acceleration in cognitive decline over a time
> series out of 103 AD trials (ADAS Cog declined 1.4 points in 6 months and 4.1
> points in 12 months).

Ex. CC at 3.

### d.      No short-term advantage for bapineuzumab

The June 17, 2008 press release did not claim a short-term advantage for bapineuzumab.

There is no conceivable argument that the non-inclusion of this item in the press release rendered

it false or misleading.  In addition, there exist at least two logical reasons why a short-term

advantage would not be expected in a trial of this sort.  First, a disease modifying treatment (as

bapineuzumab is intended to be) is presumably changing the underlying pathology of the

patient's brain by binding to and removing beta amyloid plaques.  These plaques take years to

form, and the removal of them is not likely to occur in days or weeks (just as statins do not

remove long-term plaque in cardiovascular disease in a short period of time).  Second, 95 percent

of the patients in the trial were taking approved drugs for Alzheimer's, whose beneficial effects

in treating symptoms do occur in relatively short order.  These beneficial effects may have

masked the extent of the short-term deterioration in the placebo arm of trial and accordingly may

have to wane before the full effects of bapineuzumab begin to be fully delineated.  Plaintiffs'

allegation that the supposed lack of a short-term advantage was required to be disclosed is sheer

invention.

### e.      Using the MMSE, allegedly no significant signal that bapineuzumab was effective

In the non-carriers, there was statistical significance using the MMSE (the Mini Mental

State Examination), although not in the total population.  Ex. N.  The portion of the press

conference quoted in the Complaint contains Dr. Gilman's answer relating to the total

population, as indicated by Dr. Hulme's clarifying comment.  Ex. X at 7.  Dr. Gilman's slide

presentation did not include the MMSE results but instead contained the results for the four main

cognitive (ADAS-cog, NTB) and functional tests (DAD and CDR-SB), both where they showed

statistical significance and where they did not.  The MMSE is a useful screening tool (*i.e.* used

for patient identification in Alzheimer's clinical trial enrollment) but is less meaningful in

measuring a patient's progress or decline because of the learning effect that can take place with

its administration over time.  Ex. X at 17.

### f.      12 patients developed vasogenic edema, of which three developed microbleeds

The June 17, 2008 press release disclosed that "vasogenic edema was reported in the

treated population with an increased frequency in carriers and at higher doses."  Ex. N at 2.  It

also disclosed that "the ongoing Phase 3 studies, carriers of the ApoE4 allele are being treated

with a lower dose to minimize the risk of vasogenic edema."  *Id*.  These cases had few or no

clinical symptoms, and all resolved; six of the twelve resumed dosing of bapineuzumab, and the

conclusion from the study was that bapineuzumab was "generally safe and well tolerated."

Ex. W at 8, 22; *see also* Ex. X at 3, 5 (describing vasogenic edema cases and stating belief that

risk was manageable).  The microbleeds are typical in Alzheimer's patients, and the occurrences

in the study did not appear to be of any clinical consequence.  ¶ 62; Ex. X at 9-10.  This is

consistent with FDA's granting of  "fast track" status to bapineuzumab given the absence of

disease-modifying treatments for Alzheimer's disease, and the risk-benefit calculus for

interventional therapies for grievous neurologic diseases such as Alzheimer's.

There are no facts alleged that these events threatened the potential commercial viability

of bapineuzumab and thus were required to be disclosed.  *See In re Carter-Wallace, Inc. Sec.

Litig.*, 150 F.3d 153, 157 (2d Cir. 1998) (holding that there was no duty to disclose deaths of

patients taking the drug prior to the point that the drug had "caused a statistically significant

number of . . . deaths and [they] therefore had reason to believe that the commercial viability of

Felbatol was threatened"); *In re Bayer AG Sec. Litig.*, 2004 WL 2190357, at *10 (S.D.N.Y. Sept.

30, 2004) (holding that despite numerous adverse event reports, the company was under no duty to disclose them until a consensus emerged among the company's drug safety team and consultants that "Baycol's dangers was 'putting the brand at risk'" and the defendants "viewed the adverse event reports as 'sufficiently serious and frequent to affect future earnings'").

        **g.**    **Other adverse effects occurred two times as often in treated patients.**

The June 17, 2008 press release had disclosed that "in non-carriers, the number of patients experiencing serious adverse events was similar between placebo and bapineuzumab-treated patients," while "[i]n carriers, serious adverse events were more frequently observed in bapineuzumab-treated patients than in placebo patients." ¶ 50; Ex. N at 2. These statements were true. Reasons why the adverse events were not considered particularly worrisome were addressed at the July 29 press conference:

> **Gary Stiles –** *Wyeth Pharmaceuticals – EVP & Chief Medical Officer*: "Also, remember, that a lot of these that we're seeing as [Adverse Events] are very common in Alzheimer's. When you look at anxiety, paranoid, gait disturbances, that's very typical for what you see."

> **Gordon Francis** – *Elan Corporation, PLC – SVP, Global Clinical Development*: "[W]hen talking about whether it's the neuro, has a neurologic effect or neurophysiologic effect, keep in mind that in the placebo group things like confusional states, depression, and fatigue were in fact more common with placebo than they were with active treatment [*i.e.*, bapineuzumab]."

> **Sid Gilman –** *University of Michigan – Chair of Bapineuzumab Safety Monitoring Committee*: "Local investigators looked at each of these adverse events and determined that most of them were not related to the drug. The safety monitoring committee evaluated each very carefully – the seizures, the pulmonary emboli, the DVTs. We did not see a relationship to drug. You have to remember, this is an elderly population of sick people who sit a great deal. They're liable to develop pulmonary emboli because they're liable to get deep venous thromboses. Therefore, we don't think it's directly related to the drug."

Ex. X at 18-19.

h.     **Bapineuzumab allegedly failed to show a statistically significant benefit per the original trial protocol by a "large margin"**

The June 17, 2008 press release prominently disclosed that the study had failed to achieve statistical significance in its primary endpoints.  Plaintiffs' ill-founded opinion that this was by a "large margin" does not make the disclosure misleading.  In the total population, the results failed to achieve statistical significance on two tests by fairly modest margins.  A *p* value of 0.05 or less is generally considered to show statistical significance, and the *p* value for the total population was 0.068 for NTB and 0.078 for ADAS-cog.  Ex. W at 11.  As Dr. Hulme noted at the July 29, 2008 press conference, even though the "prespecified analysis . . . did not reach statistical significance in that total population, . . . when we use the Phase II to really analyze what is going on in looking at those data in full, our post hoc analysis clearly shows there were trends in the cognitive end points of ADAS-cog and NTB in the total patient population before we subdivided those patients into carriers and non-carriers."  Ex. X at 5.

The June 17, 2008 press release did not contain any detailed results, whether favorable or unfavorable.  Thus, it did not include the results from the post hoc analysis of the "completers" in the total population that showed a strong improvement over placebo.  Ex. W at 12; Ex. V at 2. As explained at the press conference:

> Moving on to the completer analysis for that total patient population, you'll see on the left-hand side the cognitive scales, and there you'll see in the completer analysis, when all the patients that we're analyzing here have all received six infusions and have at least one post op efficacy assessment at the week 78 visit, you'll see that the ADAS-cog has a 4.3 change.  You'll see the NTB is a 0.16 change, and you'll see that the DAD is 6.1 and CDR sum of boxes 0.7.  All highly – all very strong, robust, directional changes in favor of treatment with bapineuzumab.

Ex. X at 4 (describing Ex. W at 12).  The Credit Suisse report cited in the Complaint (¶ 72) noted as well the very positive data regarding the "completers" in the total population that had not been referenced in the June 17 press release:

> Whilst after the headline data release we knew to only expect trends across all AD patients on Bapineuzumab in this trial, by looking at those patients that completed

43

all 6 doses (78 patients) there was a significant improvement over the average
drug response (but not individual doses) on the ADAS-cog, NTB and CDR-SB.

Ex. CC at 4.

### C.    Elan and Wyeth's Joint Public Statements at the ICAD Conference on July 29, 2008, Did Not Contain False or Misleading Statements

Plaintiffs allege that on July 29, 2008, Elan and Wyeth issued a press release that stated
that "the Phase 2 data reinforce the design of the ongoing Phase 3 studies by ApoE4 carrier and
non-carrier populations and the selected dose groups." ¶ 61.  This statement was false and
misleading, according to plaintiffs, because "[i]n fact, the Phase 2 Study data caused a significant
delay in those studies." ¶ 77.

This allegation makes no sense.  Whether the Phase II data caused a delay in the Phase III
trials is an entirely different issue from whether it reinforced the design of Phase III.  Plaintiffs
do not dispute that there were differences between carriers and non-carriers in Phase II or that
because of those differences, Phase III was designed to separately test bapineuzumab's efficacy
on carriers and non-carriers.  This is simply a different issue from any delay that may have
occurred in the Phase III trials.

### D.    The Alleged Misrepresentations Are Protected by the "Safe Harbor" for Forward-Looking Statements

Under the PSLRA, defendants have no liability in connection with forward-looking
statements where the statements are "accompanied by meaningful cautionary statements
identifying important factors that could cause actual results to differ materially from those in the
forward-looking statement . . . ." 15 U.S.C. § 77z-2(c)(1)(A)(i) (1997).  The only exceptions are
where the forward-looking statement was made with actual knowledge of falsity or where the
forward-looking statement encompasses a representation of present fact.  *See In re Oxford
Health Plans, Inc.*, 187 F.R.D. 133, 141 (S.D.N.Y. 1999).  Here, the statements concerning
future events are protected by the "safe harbor" for forward-looking statements under the
PSLRA because the Complaint does not allege particular facts to show that the makers of these
supposedly "false" statements had actual knowledge that they were false or misleading.  15

U.S.C. 78u-5(c)(1)(B) (2007).

Plaintiffs' bald assertion that Elan's safe harbor warnings were "ineffective to shield those statements from liability," (¶ 95), "because, at the time each FLS [forward-looking statement] was made, the speaker knew the FLS was false and the FLS was authorized and/or approved by an executive officer of Elan who knew that the FLS was false" (¶ 96), is insufficient.  There are no particularized allegations demonstrating what statement was false, who knew it was false, when that person learned that it was false and how he came to learn it.

Moreover, Elan's disclosures included meaningful cautionary language that specifically addressed the issues about which plaintiffs now complain.  First, investors were specifically warned that Elan "assume[d] no obligation to publicly update any forward-looking statements, whether as a result of new information, future developments or otherwise."  This warning accompanied a number of the most significant statements throughout the class period, including the June 17, 2008 press release and July 29, 2008 announcements.  *See* Exs. 3, 7, 14, 22, 24.

Second, the May 21, 2007 joint press release in which Elan and Wyeth announced their intention to commence Phase III trials made clear that they could not promise or predict the successful resolution of the Phase II trials, as demonstrated by the following warning:

> The statements in this press release that are not historical facts are forward-looking statements that involve risks and uncertainties and include, without limitation, the risks associated with the inherent uncertainty of the clinical development of AAB-001 [bapineuzumab] for Alzheimer's disease and whether AAB-001 will ever be approved for commercialization.  Factors which could cause actual results to differ materially from the companies' current expectations include the risks that problems or delays may arise during preparations for the proposed Phase 3 trial or, if the proposed Phase 3 trial is initiated, during the course of the Phase 3 trial, that the Phase 2 trials may not be successfully completed, and even if the Phase 2 trials are successfully completed, that results in the proposed Phase 3 trial may not show that AAB-001 is safe and effective, as well as the other risks and uncertainties described from time to time in the companies' periodic and other reports filed with the Securities and Exchange Commission.

Ex. F at 2.

The June 17, 2008 joint press release announcing the top-line results for the Phase II

trials contained a detailed warning describing the fact that further analyses of that top-line data

could yield less favorable results:

> The statements in this press release regarding the Companies' preliminary, top-line assessment of the Phase 2 data and its implications for the Phase 3 program and future development of bapineuzumab are forward-looking statements that are subject to risks and uncertainties that could cause actual results to differ materially from those expressed or implied by such statements.  In particular, these statements are subject to the risk that further analyses of the Phase 2 data may lead to different (including less favorable) interpretations of the data than the preliminary analyses conducted to date and/or may identify important implications of the Phase 2 data that are not reflected in these statements . . .

Ex. N at 3.  These warnings are meaningful cautionary language (for Wyeth and Elan), and the

statements made in the June 17, 2008 press release are within the scope of the safe harbor for

forward-looking statements.  *See Fort Worth Employers' Retirement Fund v. Biovail Corp.*, 615

F. Supp. 2d 218, 231-33 (S.D.N.Y. 2009) (holding that statements about prospect of FDA

approval within safe harbor because of cautionary language regarding risk of non-approval).

## II.    THE AMENDED COMPLAINT FAILS TO ADEQUATELY ALLEGE SCIENTER

Under the PSLRA, a plaintiff alleging securities fraud must "state with particularity facts

giving rise to a strong inference that the defendant acted with the required state of mind."

15 U.S.C. §78u-4(b)(2) (2007).  The requisite scienter plaintiffs must allege is "an intent to

deceive, manipulate or defraud."  *Kalnit v. Eichler*, 264 F.3d 131, 138 (2d Cir. 2001).  Plaintiffs

may plead intent either by alleging facts that (i) show that defendants had both motive and

opportunity to commit fraud, or (ii) constitute strong circumstantial evidence of conscious

misbehavior or recklessness.  *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir. 1995).  In

order to withstand a motion to dismiss, the plaintiffs' theory "must be more than merely

plausible or reasonable – it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309 (2007).

Further, a court "must consider plausible nonculpable explanations for the defendant's conduct."

*Id.* at 310.

Here, the nonculpable explanations for Elan and Wyeth's actions are straightforward and

far more compelling than plaintiffs' unsupported speculation about other motives.  Elan and Wyeth did not comment on the data from the interim review of the Phase II results in their May 21, 2007 press release because the trial was ongoing and remained blinded; disclosing the data would have compromised the integrity of the trial, to the detriment of Elan and Wyeth, their investors, and patients.  *See* Section F, *supra*.  The motivation for not including the detailed results of the Phase II trial in the June 17, 2008 press release was the embargo imposed by ICAD (which was routine for significant data presentations at medical conferences) and the fact that Elan and Wyeth were proceeding on a timetable to have the analyses of the detailed results confirmed and presented at ICAD in late July 2008.  *See* Section H, *supra*.

These were scientific and business motivations that, "whether wise or not, [are] quite different from an intent to deceive."  *Cozzarelli v. Inspire Pharm., Inc.*, 549 F.3d 618, 626 (4th Cir. 2008).  In *Cozzarelli*, the court held that plaintiffs' allegations that defendants withheld details of a clinical trial from the market to conceal that trial's impossibility of success were insufficient where defendants' "legitimate business motivations explain[ed] each of the facts alleged in the complaint more convincingly than plaintiffs' tenuous theory of wrongful intent."  *Id*.  The court noted that "plaintiffs ha[d] not alleged the existence of any internal documents . . . or other direct statements contradicting [the idea] that defendants acted with a lawful intent based on their competitive interests."  *Id.*

The Complaint offers virtually nothing to weigh against these business and scientific reasons for Elan and Wyeth's actions.  The Complaint alleges that Elan sought to (i) hasten patient enrollment in the Phase III trials and (ii) temporarily increase its stock price (although this second theory is only half-heartedly suggested at one point in the Complaint (¶ 85)).  These theories are less than tenuous and are insufficient to show scienter.

### A.    Plaintiffs Have Not Alleged a Plausible Motive for Fraud

General motives regarding a company's desire that its products succeed are insufficient to plead scienter.  Plaintiffs' allegations that "[a] positive perception of bapineuzumab was

critically important to Elan," (¶ 85), and that if the bapineuzumab Phase II and III trials were not successful, Elan "will be materially and adversely affected," (¶ 86 (emphasis omitted)), are general, not particularized, and are plainly insufficient.  As the Second Circuit held in *Chill v. General Electric Co.*, 101 F.3d 263, 268 (2d Cir. 1996), "[t]he motive to maintain the appearance of corporate profitability, or of the success of an investment" cannot give rise to scienter because "if scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions." The Fourth Circuit made a similar observation in the pharmaceutical context:

> All investments carry risk, particularly in a field like biopharmaceuticals.  If we inferred scienter from every bullish statement by a pharmaceutical company that was trying to raise funds, we would choke off the lifeblood of innovative medicine by fueling frivolous litigation – exactly what Congress sought to avoid by enacting the PSLRA.

*Cozzarelli*, 549 F.3d at 627 (4th Cir. 2008).

Plaintiffs' other theory of scienter fails for the same reason, and many others.  The Complaint alleges that Elan was motivated to "conceal the adverse results of the Phase 2 Study to enroll the Phase 3 trials which Elan needed to conduct before it could receive FDA approval for bapineuzumab."  ¶ 87.  Plaintiffs allege no actual facts in support of this theory, which is nothing more than speculation and cannot form the basis of a compelling inference of scienter. *See, e.g., In re Inspire Pharm., Inc. Sec. Litig.*, 515 F. Supp. 2d 631, 639 (M.D.N.C. 2007) (rejecting plaintiffs' scienter allegations where plaintiffs "[took] a significant leap from their allegations of motive and opportunity to their conclusion of intent – all without providing sufficient facts to connect the two").

Moreover, a motive to increase enrollment in trials is a generic one that could apply to all companies conducting trials that required the participation of volunteers.  If this motive were sufficient to satisfy the scienter requirement, then every pharmaceutical company engaged in clinical trials would be required to defend securities cases regardless of any actual scienter.  A similar theory was rejected in *In re Pfizer, Inc. Securities Litigation*:

> Plaintiffs attempt to plead motive by alleging that Pfizer had a 'desperate need . . . to assure the financial community of the existence of a new blockbuster drug.' This is not a unique motive.  Rather, it is a way of saying, in a manner tailored to a pharmaceutical company, something that is true for all profit enterprises – each has an incentive to portray the likelihood that it will continue to prosper.

538 F. Supp. 2d 621, 635 (S.D.N.Y. 2008).

Plaintiffs' theory of a motive to increase patient enrollment by misrepresenting clinical results is also highly implausible.  The FDA was involved at every stage of the process, reviewed the data, and approved the design of the Phase III trials.  It is absurd to think that Elan and Wyeth would work with the FDA in order to get bapineuzumab approved and at the same time act as if the FDA would not notice or object if they defrauded vulnerable and elderly patients into participating in the trials.[13]  It makes no sense that Elan and Wyeth would conceal clinical trial results in order to enroll patients in a very large and complex Phase III program of dubious value that would cost hundreds of millions of dollars.  The Phase III clinical trials for bapineuzumab involve 350 sites worldwide, dozens of doctor-investigators, four thousand patients, and multiple MRI screenings for each patient.  It is not plausible that Elan and Wyeth would undertake a project of this magnitude and complexity without a good-faith belief in its prospects for success.

Courts routinely refuse to credit such illogical and implausible inferences.  *Cozzarelli*, 549 F.3d at 627 ("It is improbable that [the company] would stake its existence on a drug and a clinical trial that the company thought was doomed to failure.  Plaintiffs' inference of fraud . . . is thus not even plausible, much less convincing"); *Oppenheim Pramerica Asset Mgmt. v. Encysive Pharm., Inc.*, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007) (plaintiffs failed to properly allege scienter regarding pharmaceutical company's alleged misstatements regarding its drug Thelin where defendant "used a large part of the money it acquired from the stock sales to

---

[13]  *See, e.g.*, *In re Axonyx Sec. Litig.*, 2009 WL 812244, at *3 (S.D.N.Y. Mar. 27, 2009) (rejecting plaintiffs' scienter theory that defendants knowingly or recklessly designed a defective Phase III trial to defraud investors because "[t]he idea that this company, highly dependent on the success of the new drug, would knowingly or recklessly carry on a defective trial – so that any defects were not remedied – virtually defies reason, unless the company was bent on defrauding the FDA and the suffering people who might use the drug").

finance the development of Thelin, indicating Defendants' belief that Thelin's potential as a successful and lucrative product for the company justified the expenditures").  As the Second Circuit held in *Shields v. Citytrust Bancorp Inc.*, 25 F.3d 1124, 1129-30 (2d Cir. 1994), "Plaintiffs' view of the facts defies economic reason, and therefore does not yield a reasonable inference of fraudulent intent."

Finally, plaintiffs' theory must fail because scienter requires an intent to deceive the plaintiffs, not some third party.  *See, e.g., Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir. 1984) (proof of scienter requires that the plaintiff "demonstrate knowing or intentional misconduct on the part of the defendant, or an intent to deceive, manipulate, or defraud *investors*") (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185 (1976) (emphasis added).  The purported motive to increase enrollment that plaintiffs allege is one that involves the alleged deception of an entirely different group of individuals.

In *ECA and Local 134 Ibbew Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, the Second Circuit found that plaintiff shareholders, in pleading that defendant JPMC's misstatements had helped "conceal Enron's financial quandary," had not adequately pled scienter because they "fail[ed] to show an intent to defraud JPMC's shareholders rather than Enron's shareholders."  553 F.3d 187, 203 (2d Cir. 2009).  The court reasoned that "even if JPMC was actively engaged in duping other institutions for the purposes of gaining at the expense of those institutions, it would not constitute a motive for JPMC to defraud its own investors."  *Id.  See also In re PDI Sec. Litig.*, 2006 WL 3350461, at *1 (D.N.J. Nov. 16, 2006) (motive to deceive potential contract parties insufficient to show intent to defraud investors); *Kalnit v. Eichler*, 99 F. Supp. 2d 327, 338-39 (S.D.N.Y. 2000) (scienter not shown by an alleged intent to defraud a contractual counterparty, not the shareholders); *Hill v. The Tribune Co.*, 2006 WL 2861016, at *8 (N.D. Ill. Sept. 29, 2006) (alleged misrepresentations about newspaper's circulation were intended to increase advertising rates, not to defraud shareholders, and scienter allegations were therefore inadequate).

**B.      Plaintiffs' Allegations Do Not Support an Inference of Conscious Misbehavior or Recklessness**

Plaintiffs do not, and cannot, come close to alleging facts that meet the Second Circuit's high standard for conscious misbehavior or recklessness on the part of any of the defendants.  In *In re Carter-Wallace, Inc. Securities Litigation*, 220 F.3d 36 (2d Cir. 2000), the court held that to survive dismissal under the conscious misbehavior theory, a plaintiff must show reckless conduct which is "at the least . . . highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the nature was either known to the defendant or so obvious that the defendant must have been aware of it."  *Id.* at 39.  No such conduct has been alleged here.

Plaintiffs have failed to allege any facts to suggest that Elan or the individual defendants[14] did not believe that the Phase II interim data was not strong, clinically meaningful or spectacular; or that the June 17, 2008 press release did not accurately portray the results of the Phase II study.  Courts have frequently found allegations of conscious misbehavior or recklessness to be inadequate in similar contexts.  In *In re Astrazeneca Securities Litigation*, 559 F. Supp. 2d 453 (S.D.N.Y. 2008), plaintiffs alleged that the drug Exanta "was not as safe or effective as defendants' public statements made it out to be, and that several risks . . . were not disclosed or were misstated over the course of the class period."  *Id.* at 457.  The court rejected plaintiffs' conscious misbehavior theory of scienter because "[n]othing appears in the complaint showing that there was a consensus of the management that the risks of Exanta made the drug unlikely to be approved" and "other facts . . . made it not unreasonable for defendants to believe in their product"; thus, plaintiffs "have not alleged anything to negate the idea that defendants were attempting to develop a drug they thought beneficial and were so describing it to the public."  *Id.* at 471.

---

[14]  Because plaintiffs have not adequately alleged that any agent of Elan had the requisite scienter to deceive investors, their claims against Elan must fail as well.  *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 853 (2d Cir. 1981).

In *Johnson v. Pozen*, the court rejected plaintiff's scienter theory that defendants failed to disclose details regarding positive results of genotoxicity tests in order to deceive investors about the timing of FDA approval of the subject drug.  The court concluded, "[i]t is more compelling . . . to infer that Defendants merely viewed the positive results of the CHO study as minor and that they honestly believed the positive results would not pose a barrier to [FDA] approval." 2009 WL 426235, at *20 (M.D.N.C. Feb. 19, 2009).  The court noted, "even if Defendants were less than 'transparent' with regard to the genotoxicity tests, and even if the failure to disclose was misleading . . . the more compelling inference here is that Defendants acted innocuously, or even negligently, with regard to disclosure of the genotoxicity tests, as opposed to acting recklessly or with fraudulent intent."

Plaintiffs cannot show conscious misbehavior or recklessness where the motive for the alleged omission can be attributed to nothing more than a difference of scientific opinion about the importance and interpretation of aspects of complex scientific data.  *See, e.g., In re Biogen*, 179 F.R.D. 25, 38 (D. Mass. 1997) (finding that "plaintiffs cannot demonstrate either fraudulent intent or recklessness in Biogen's failure "to disclose that certain endpoints were met only in retrospective analyses "[g]iven the "split of expert opinion regarding the importance of prospectively defined endpoints"); *In re Medimmune, Inc. Sec. Litig.*, 873 F. Supp. 953, 966 (D. Md. 1995) (noting that "[m]edical researchers may well differ . . . in the interpretation of test results," and that such disagreement does not support an inference of scienter by a drug company); *Padnes v. Scios Nova, Inc.*, 1996 WL 539711, at *5 ("[r]easonable minds could differ with respect to the value of the Colorado study in determining the therapeutic effects of Auriculin.  Reasonable minds cannot conclude, however, that defendants' failure to exhaustively catalogue those possibilities was fraudulent.")

**III.    THE COMPLAINT FAILS TO STATE A CLAIM UNDER SECTION 20(a) OF THE SECURITIES EXCHANGE ACT**

Plaintiffs have asserted claims under Section 20(a) of the Securities Exchange Act, 15 U.S.C. §78t(a), against each of the individual defendants.  To establish this claim, plaintiffs must allege "(1) an underlying primary violation by the controlled person; (2) control over the controlled person; and (3) particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person." *Ellison v. Am. Image Motor Co. Inc.*, 36 F. Supp. 2d 628, 637 (S.D.N.Y. 1999) (*citing S.E.C. v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)).  Plaintiffs' claim fails for two reasons.  First, plaintiffs have failed to plead an underlying violation of the securities laws by any of the defendants.  Second, plaintiffs have failed to plead particularized facts alleging "culpable participation" on the part of the individual defendants.

**CONCLUSION**

For the foregoing reasons, the Defendants' motion to dismiss should be granted and the Complaint should be dismissed with prejudice.

Dated: December 11, 2009                          Respectfully submitted,


                                                 SHEARMAN & STERLING LLP


                                                 By:    s/ Jaculin Aaron

                                                    Jaculin Aaron
                                                    Daniel M. Segal
                                                    599 Lexington Avenue
                                                    New York, New York 10022-6069
                                                    (212) 848-4000
                                                    Fax: (212) 848-7179

                                                    *Counsel for Defendants Elan*
                                                    *Corporation, plc, G. Kelly Martin,*
                                                    *and Lars Ekman*